**Kermit H. GEORGE, Janet H. George, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. Nos. 89V–252–N, 89V–262–N.

United States District Court, M.D. Alabama, N.D.

April 30, 1990.

Joe T. Booth, III, and James W. Cameron, Montgomery, Ala., for plaintiffs.

David Allred, Asst. U.S. Atty., Montgomery, Ala., for defendant.

## OPINION

VARNER, District Judge.

This cause is now before the Court for final determination of the issue of liability

based upon the evidence produced in open Court on April 18, 1990.[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1346.

The cases at bar arise from an alligator attack on Plaintiff, Kermit H. George, while he was swimming in the Open Pond Recreation Area of the Conecuh National Forest. Plaintiff, Janet H. George, seeks recovery for loss of consortium. Plaintiffs bring this action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq. [hereinafter the Act]. The parties have stipulated to most of the material facts necessary for this Court to make a determination as to the issue of liability.

Mr. George was injured on July 26, 1986, in the Open Pond Recreation Area of the Conecuh National Forest. The recreation area, which includes a designated swimming area, is owned and operated by the United States Forest Service. The Government now admits that the area was operated as a noncommercial recreational area, despite the fact that a small fee was charged for certain uses of the park, none of which it now appears applies to the use of the swimming area. On the day of the attack, Mr. George and his unleashed dog entered the area from the rear entrance and proceeded around the park to the swimming area. Mr. George's dog preceded Mr. George into the water and then exited sometime after Mr. George had waded approximately chest deep into the designated swimming area. Shortly after his entrance into the water, Mr. George was attacked by a large alligator, which ultimately severed Mr. George's right arm at the shoulder. The Forest Service officials admit that they had knowledge of the presence in the Open Pond Area of the 11–to–12–foot alligator which attacked Mr. George. The evidence showed that, of the 74 confirmed, nonfatal alligator attacks in the neighboring State of Florida, 53 were committed by alligators in excess of five feet in length. [See Plaintiffs' Exhibit 1]. Furthermore Forest Service officials admit

---

1. Pursuant to the agreement of the parties, this Court bifurcated the issue of damages pending a determination of whether liability existed.

that they had received several complaints concerning the alligator prior to the attack on Mr. George. Additionally, the Government admits that it neither posted signs warning of the alligator nor attempted to remove said alligator.

Joe Brown, Forest Supervisor of all national forests in Alabama, Larry Hedrick, Wildlife Biologist for the Forest Service, Buddie Risner, Acting District Ranger for the Conecuh National Forest, John Maurer, Forest Technician, and Harris LeMaire, Forest Technician, were all employed by the United States Forest Service and were working within the scope of their employment as federal employees at all times relevant to these cases. All were aware of the presence of a large alligator, presumably the one which attacked Mr. George, in and near Open Pond within the seven-week period preceding the attack on Mr. George, which occurred on July 26, 1986. Their knowledge came from the following reports and observations:

On or about June 3, 1986, Harris Le-Maire received complaints from unknown persons that a large alligator was following people who were fishing at Ditch Pond, a pond near Open Pond and within the recreational area. Mr. LeMaire reported such observations to John Maurer. Mr. Maurer reported the observations to Buddie Risner. Mr. Risner reported the observations to Larry Hedrick. Mr. Maurer also spoke to Thaggard Colvin, State of Alabama employee who said that he had seen a large alligator in Open Pond on May 31, 1986.

On June 5, 1986, Mr. Maurer was told by Warren Brown and William Jerry Barnes, two users of the recreation area, that they were concerned about a large alligator which they had seen in Open Pond and Ditch Pond. Mr. Maurer told Mr. Risner of the reporter, and Mr. Risner relayed the information to Joe Brown.

On or about June 8, 1986, Mr. Risner observed a large alligator in Ditch Pond which followed his fishing boat, and Mrs. Risner, while walking along the bank of Ditch Pond, was followed for over 100 yards by a large alligator in the edge of the water.

On June 17, 1986, Barbara Blackwell, a recreation area user, reported to Mr. Maurer and Dale Gentry, a Forest Service employee, that she had seen a large alligator in the Open Pond swimming area. This information was reported to Larry Hedrick.

On July 7, 1986, V.J. Godwin, a camper at Open Pond Recreation Area, told Mr. Maurer that he had seen a large alligator in Open Pond. On the same day, Mr. Maurer observed a large alligator in Open Pond which appeared to have no fear of humans. Mr. Maurer reported the incidents to Mr. Risner, and Mr. Risner reported the incidents to Mr. Hedrick.

On July 13, 1986, Mr. Maurer saw a large alligator near the swimming area in Open Pond.

The Forest Service was aware that on July 19, 1981, Donna Loman had been attacked by an alligator while swimming in the designated swimming area at Open Pond. The alligator which attacked Ms. Loman was trapped and found to be functionally blind, as well as to have an injured or deformed foot. That alligator was removed from the recreation area to an area approximately five miles from Open Pond.

On June 25, 1983, Terry Horn claimed that he had been bitten by an alligator while swimming in the Open Pond swimming area. An investigation by the Forest Service failed to confirm the alleged attack. Nevertheless, the Forest Service trapped a large alligator in the area which proved to be the same alligator which had attacked Ms. Loman in 1981. The alligator was removed to South Carolina.

After the report received on June 3, 1986, Harris LeMaire and John Maurer suggested either trapping and removing the large alligator or posting warning signs at Open Pond. At Mr. Maurer's instruction, Mr. LeMaire purchased wire mesh in order to repair a trap for the purpose of trapping the alligator. Mr. Maurer was instructed by Forest Service officials not to

trap the alligator and not to post warning signs.

During June and July, 1986, Joe Brown, Larry Hedrick and Buddie Risner discussed the presence of a large alligator in and near Open Pond as reported and observed and the appropriate course of action to take regarding the alligator. Messrs. Brown Hedrick and Risner decided to take no immediate action other than monitoring the situation for several policy reasons, including their information that the alligator was in good physical condition, that the alligator had been in the area for many years and that the alligator had not attacked humans or domestic animals. They also were aware that the alligator was a protected species. Messrs. Brown, Hedrick and Risner also believed that posting warning signs might suggest to the public that all potential natural dangers or risks would be posted. Finally, they thought that the risk of an alligator attack was minimal and that warning signs would unnecessarily frighten the public.

For at least five years preceding the attack on Mr. George, Messrs. Joe Brown, Larry Hedrick, John Maurer and Harris LeMaire had knowledge of the following publication with respect to alligators:

"Gators CANNOT be tamed. Feeding them can result in their mistaking a hand for a handout! Federal Regulations prohibit the feeding or molesting of alligators!! Any swimming in these waters will be at your own risk.

"The American alligator, an endangered species in Alabama, is native to this area. They frequently appear in Open, Buck and Ditch Ponds and in Blue Lake. These natural bodies of water have provided alligator habitat for hundreds and perhaps thousands of years.

"The fact that alligators frequent lakes and ponds used for human recreation is not, by itself, cause for alarm. This is because alligators are normally extremely wary and avoid man whenever possible. However, some reptiles become conditioned to the presence of man, usually as a result of having been habitually fed by people cleaning fish or campers with leftover food. Large reptiles so conditioned must be considered dangerous. This is particularly true where people swim in waters inhabited by alligators. Your chances of encountering an alligator while swimming are not great. However, there always remains some possibility for such an encounter, therefore, any swimming in these waters will be at your own risk. Should you choose to swim, be alert for large alligators that exhibit abnormal behavior. Swim only during daylight hours."

The Government has advanced several arguments in support of a finding that no liability exists for the loss of Mr. George's right arm. First, the Government has renewed its contention (previously ruled on by this Court) that the Alabama Recreational Use Statute [CODE OF ALABAMA [1975], §§ 35–15–1, *et seq.* and 35–15–20, *et seq.*] precludes a finding of liability in this case. Secondly, the Government contends that the discretionary function exception [28 U.S.C. § 2680(a)] bars recovery. Finally, the Government asserts that Mr. George was contributorily negligent in either allowing his dog to enter the park unleashed, which was in violation of posted park regulations, or going swimming in an area Mr. George knew to be inhabited by alligators.[2]

DISCRETIONARY FUNCTION. Title 28 U.S.C. § 2680(a), provides that jurisdiction pursuant to 28 U.S.C. § 1346(b) shall not apply to:

"Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

---

**2.** The parties have previously briefed the law with respect to the Alabama Recreational Use Statute and the discretionary function exception.

Plaintiffs have alleged that Defendant was negligent in failing to warn users of the Open Pond area of the presence of alligators and/or failing to remove the alligator that attacked Mr. George in the swimming area. Defendant argues that such decisions are discretionary and, thus, insulated from liability by virtue of § 2680. The thrust of Defendant's argument stems from its contention that the forest officials charged with supervision of the Conecuh National Forest were of the opinion that neither the alligator which attacked Mr. George nor any other alligator presented any danger to the persons who used the recreation areas. In support of this contention, Defendant introduced testimony by several forest officials that there had been only one confirmed alligator attack on a human in the Conecuh National Forest prior to the attack on Mr. George. Furthermore, the prior attack had been instigated by a blind alligator with a clubfoot which, subsequent to the attack, was captured and transported to South Carolina.[3] The forest officials admit that they were aware of the presence of the alligator which attacked Mr. George for some time but that this particular alligator had exhibited no signs of aggressive behavior toward humans. Additionally, the forest officials state they had no knowledge of any incidents concerning the alligator that would require them to take remedial action. Forest officials based their determination on the fact that the alligator which attacked Mr. George had merely been following park guests and employees. However, at least one witness, Warren Brown, testified that, while he was snorkeling in Open Pond, an alligator chased him onto the shore and "hissed" at him. Mr. Brown reported this incident to Forest Service officials sometime in 1983 or 1984. Additionally, Plaintiffs' expert, Dr. Robert Mount, testified that alligators typically catch their prey by stealth as opposed to exhibiting obvious aggressive behavior. Moreover, Larry Hedrick, Forest Service Biologist stationed in the Supervisor's Office in Montgomery, testified on cross-examination that most of his knowledge of alligators came after the attack on Mr. George, the relevance of this admission by Mr. Hedrick being that he was not qualified to decide whether the alligator and the complaints received about such warranted any action on the part of the Forest Service. Upon considering whether or not remedial measures were required, forest officials determined that the alligator(s) posed no threat to the park visitor or, at least, no more of a threat than poisonous snakes and other natural hazards which one would expect to be present in a national forest located in South Alabama. Based on these facts, coupled with specific regulations dealing with the removal of alligators, Defendant argues that the forest officials' decision to neither remove the alligator, erect barriers around the designated swimming area, nor to post any warning signs was a discretionary function and, as such, shields the Government by virtue of § 2680(a), from tort liability under the Act.

This Court finds by a preponderance of the evidence that at least six incidents of aggressive alligator behavior had been reported to various forest officials. Additionally, the District Ranger of Conecuh National Forest from November, 1975, until May, 1986, William Gilder, testified that he reported the alligator problem to the Forest Service headquarters in Montgomery by letter of October 9, 1985, [Plaintiffs' Exhibit 21] and suggested that signs be posted. Accordingly, this Court must determine if the discretionary function doctrine bars Plaintiffs' instant suit, notwithstanding this Court's finding that the Forest Service had actual knowledge of the alligator problem and failed to take any corrective or preventative measures.

---

**3.** The evidence showed that Donna Jean Loman was attacked by this alligator in 1981. After the attack, this particular alligator was captured and released five miles from Open Pond in Yellow River. In 1983, another swimmer claimed that he was bitten on the arm by an alligator. Mr. John Maurer, Forest Technician at the Conecuh National Forest in 1983, investigated his allegations and concluded that he had not been attacked by an alligator but, rather, had been stabbed in the arm with a barbecue fork by his wife during a domestic dispute. Notwithstanding Mr. Maurer's conclusions as to that incident, the clubfooted alligator was again trapped and removed to South Carolina.

The hallmark case expounding on and interpreting the discretionary function exception of § 2680 is *Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–968, 97 L.Ed. 1427 (1953), wherein the Court stated:

"It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operation of government in accordance with official directions cannot be actionable."

In finding that no liability existed with respect to a fertilizer explosion, the *Dalehite* Court distinguished between decisions "made at a planning rather than operational level". *Id.*, at 42, 73 S.Ct. at 971. The *Dalehite* Court further found that the Government had no knowledge of a probable danger with respect to the handling of the fertilizer. *Id.*

Two years after *Dalehite*, the Court decided *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). In *Indian Towing*, plaintiff sued the Government under the Act for the Coast Guard's alleged negligence in operating a lighthouse. The light had apparently malfunctioned due to a short in the wiring. The Court held the Government liable for the Coast Guard's negligence in failing to maintain the lighthouse and in failing to warn of the inoperational status of the lighthouse. Moreover, in considering whether the discretionary function exception barred the suit, the Court stated:

"The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning." *Indian Towing, supra*, at 69, 76 S.Ct. at 126.[4]

Four years after *Dalehite*, the Supreme Court again had the opportunity to further delineate what types of governmental decisions are protected by the discretionary function doctrine. *Rayonier v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957). In *Rayonier*, plaintiffs alleged, among other things, that the Forest Service was negligent in allowing a smoldering fire to continue to burn and subsequently develop into a raging fire, resulting in the destruction of acreage for a 20–mile area. The Court held that the Government could be liable for the Forest Service's negligence in allowing the smoldering fire to continue to burn. Implicit in the *Rayonier* Court's holding, and of particular relevance to the cases at bar, is that no discretion existed as no reasonable range of choices were presented as to whether or not to extinguish the smoldering ash. The Court further recognized that, when the Government is held liable for its negligence, the cost of such is spread over all taxpayers and, thus, is relatively slight, "[b]ut when the entire burden falls on the injured party it may leave him destitute or grievously harmed." *Rayonier, supra*, at 320, 77 S.Ct. at 377. The effect of the *Indian Towing* and *Rayonier* decisions was to restrict the broad guidelines that had been enunciated in *Dalehite*.

---

**4.** At least one Court has interpreted *Indian Towing* as holding: "[T]hat once the government does undertake to supply a service, then it must be held responsible for negligent acts in supplying the service. This means that the discretionary exception only reaches the discretionary decision as to whether to supply the service or not.

But once the discretionary decision has been made to supply the service, then the very purpose of the Tort Claims Act was to waive sovereign immunity and allow recovery for negligent actions of the government beyond the discretionary decision." *Wiggins v. United States*, 799 F.2d 962, 966 (5th Cir.1986).

*Butler v. United States*, 726 F.2d 1057, 1062–63 (5th Cir.1984).

The Supreme Court in *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 811–12, 104 S.Ct. 2755, 2763–64, 81 L.Ed.2d 660 (1984), recognized that its decisions with respect to the discretionary function doctrine had "not followed a straight line". *Varig Airlines, supra*, at 811, 104 S.Ct. at 2763. The *Varig* Court thus proceeded to set forth "several factors useful in determining when the acts of a Government employee are protected from liability by § 2680(a)." *Id.*, at 813, 104 S.Ct. at 2764. The Court stated that the first consideration should be "the nature of the conduct, rather than the status of the actor." *Id.* "Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *Id.* The second factor is whether or not the Government is "acting in its role as a regulator of the conduct of private individuals." *Id.*, at 813–14, 104 S.Ct. at 2764.

The Court reaffirmed the reasoning of *Varig* in *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), and further refined the factors to be considered in determining whether the Government's conduct is protected by § 2680. The Court stated:

> "In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. *See Dalehite v. United States*, 346 U.S. 15, 34 [73 S.Ct. 956, 967, 97 L.Ed. 1427] (1953). * * * Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful

option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect. *Cf. Westfall v. Erwin*, 484 U.S. 292, 296–97 [108 S.Ct. 580, 583–84, 98 L.Ed.2d 619] (1988). * * *

> "Moreover, assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield. The basis for the discretionary function exception was Congress' desire to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' *United States v. Varig Airlines supra* [467 U.S.] at 814 [104 S.Ct. at 2765]. The exception, properly construed, therefore, protects only governmental actions and decisions based on considerations of public policy. *See Dalehite v. United States*, supra [346 U.S.] at 36 [73 S.Ct. at 968]. ('Where there is room for policy judgment and decision there is discretion'). In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissable exercise of policy judgment." *Berkovitz, supra*, 486 U.S. at 536–37, 108 S.Ct. at 1958–59.

The test to be applied to the cases at bar is, thus, whether the forest officials had discretion to make the choice of not taking any remedial measures with respect to the alligator problem,* and, if so, whether such choice was one which Congress intended to shield from liability by virtue of § 2680(a). In resolving these issues, several cases are instructive.

In *Denham v. United States*, 646 F.Supp. 1021 (W.D.Tx.1986), *affm'd*. 834 F.2d 518 (5th Cir.1987), a case factually indistinguishable from the cases at bar, plaintiff was injured while swimming in a designated swimming area maintained and

---

* See Appendix A attached hereto.

controlled by the Army Corps of Engineers [hereinafter Corps]. The district court found that the Corps outlined the designated swimming area with buoys secured by concrete anchors. *Denham, supra,* 646 F.Supp. at 1023. The trial court further found that the Corps had knowledge of the fact "that some of the buoys had become unattached from their anchors, leaving the anchors (as shallow underwater obstructions) on the bottom of the swimming area. Nothing was done to try and locate, (mark or) remove such anchors." *Id.* The plaintiff waded into the swimming area and instituted a shallow water dive, which resulted in his injuring himself upon striking one of the unmarked anchors. *Id.* No signs were posted warning of the known danger or warning swimmers to swim at their own risk. *Id.* The Government argued that § 2680(a) barred plaintiff's suit. *Id.,* at 1024. The trial court held § 2680(a) inapplicable and specifically found "that the critical discretionary decision was in deciding whether to create a designated swimming area. * * * Accordingly, the Government created the danger which gave rise to Denham's injury after the initial discretionary decision had been made." *Id.*

In affirming the district court, the Fifth Circuit Court of Appeals, relying on *Wysinger v. United States,* 784 F.2d 1252 (5th Cir.1986), quoted *Wysinger* for the proposition "that 'once the government has made a decision to act the government is responsible for acts negligently carried out even though discretionary decisions are constantly made as to how those acts are carried out'." *Denham v. United States, supra,* at 520 [quoting *Wysinger, supra,* at 1253]. The Court further recognized that "there are discretionary elements in all decisions. The ultimate question, as stated by the Supreme Court, is 'whether the challenged acts * * * are of the nature and quality that Congress intended to shield from tort liability.' *United States v. Varig Airlines,* 467 U.S. 797, 813 [104 S.Ct. 2755, 2764, 81 L.Ed.2d 660] (1984) [citations omitted]." *Id.,* at 521. The Court concluded by stating that "[they did] not believe that

Congress intended one who was injured because of a danger negligently created by the Corps within a designated swimming area to have no legal remedy." *Id.* This would arguably apply with even greater force if the danger were known to a Government agency and hidden from the party injured thereby.

The *Wysinger* decision, relied on by the *Denham* Court, involved a small boy who drowned at a park operated by the Forest Service. Plaintiff, the mother of the boy, claimed the Government was negligent in failing to provide lifeguards.[5] In affirming the district court's dismissal of plaintiff's suit, the Court stated that the decision to not have a lifeguard at the swimming site was one which was encompassed by the discretionary function exception. *Wysinger, supra,* at 1254. However, the Court went on to state that "[o]nly if there had been a lifeguard on duty who acted negligently or the government had negligently failed to warn of dangers at the swimming site would there be jurisdiction under the Federal Tort Claims Act." *Id.*

In *Butler v. United States,* 726 F.2d 1057 (5th Cir.1984), the Corps dredged an area near a sea wall, thereby creating a severe depression in a swimming area nearby. The Corps posted some signs warning of the danger; however, the evidence showed that such signs were inadequate to warn swimmers who entered the area from the south. *Id.,* at 1064. The Court held that the Government was negligent in failing to "either fill in the depression or adequately warn swimmers of the danger." *Id.* The Court further held that the discretionary function doctrine did not apply to bar the plaintiff's suit. At best, the doctrine applied only to the decision to undertake to repair the seawall. *Id.,* at 1062–63.

Defendant in the cases at bar has cited this Court to several cases which tend to support Defendant's position. Upon a cursory examination of several of these cases, it would appear that they are factually similar to the instant cases; however, upon

---

5. The Forest Service had posted signs that informed users of the swimming area that no lifeguard was on duty and that one should swim at his own risk. *Wysinger, supra,* at 1253.

closer scrutiny, it appears without question that such cases are clearly distinguishable from the cases at bar.

In *Bowman v. United States*, 820 F.2d 1393 (4th Cir.1987), plaintiff drove his vehicle off a federally-controlled parkway in the Shenandoah National Park. *Id.*, at 1393. The plaintiff contended that the Government was negligent in failing to erect guardrails along the parkway or in failing to post signs warning of the steep embankment. The Court, in affirming the district court's dismissal of the case, held that the discretionary function doctrine barred plaintiff's suit. *Id.*, at 1395. The Court stated that whether the decision to take no action "grew out of a lack of financial resources, a desire to preserve the natural beauty of the vista, a judgment that the hazard was insufficient to warrant a guardrail, or a combination of all three is not known. What is obvious is that the decision was the result of a policy judgment." *Id.* However, the Court clearly pointed out that the danger was open and obvious and, further, that the primary purpose of the parkway was "not to facilitate transportation and travel". In the cases at bar, the presence of the alligator was not open and obvious to a person who chose to use the swimming area. Furthermore, one of the primary purposes (if not the primary purpose) of the national forest was to provide a recreation area for individuals who chose to visit the park. These two factors clearly distinguish *Bowman* from the instant cases.

The other case factually similar to the instant cases is *Chrisley v. United States*, 620 F.Supp. 285 (D S.C.1985), *affm'd.* 791 F.2d 165 (4th Cir.1986). In *Chrisley*, the Corps maintained a dam and lake on the Georgia and South Carolina border. *Id.*, at 286. The shoreline below the dam was a popular fishing area that had no signs warning of the steep embankment and swift current. *Id.*, at 287. Plaintiff's son fell in the water and drowned. The Court held that the decision of whether to restrict the area in question or to post warning signs was a discretionary function. *Id.*, at 289. The Court expanded on its holding with respect to warning signs by relying on

a line of cases that held where the danger is not hidden, the Government has no duty to warn. *Id.*, at 290. *See Harmon v. United States*, 532 F.2d 669 (9th Cir.1975); *Henretig v. United States*, 490 F.Supp. 398 (S.D.Fl.1980); *Fitzgerld v. Alba*, 261 F.Supp. 915 (S.D.N.Y.1966); *but see Smith v. United States*, 546 F.2d 872 (10th Cir. 1976); *Price v. United States*, 530 F.Supp. 1010 (S.D.Miss.1981), *affm'd. as modified sub nom. Butler v. United States, supra; Stephens v. United States*, 472 F.Supp. 998 (C.D.Ill.1979). However, as the Court clearly points out, the danger of the steep embankment and the swift current were open and obvious. *Chrisley, supra,* at 289. Furthermore, plaintiff warned his son of the dangers present at the lake's edge. *Id.*, at 287. Therefore, the open and obvious nature of the danger and the fact that plaintiff's son was warned of the danger distinguish *Chrisley* from the cases at bar.

This Court further finds the cases of *Johns v. Pettibone Corp.*, 843 F.2d 464 (11th Cir.1988) and *Ford v. American Motors Corp.*, 770 F.2d 465 (5th Cir.1985), unpersuasive. The *Johns* case dealt with the TVA's delegation of safety responsibility to an independent contractor, which assumed responsibility for its employees. The Court correctly held that the decision of whether and what extent to regulate private individuals is a matter of discretion. *Id.*, at 467. The *Ford* case dealt with the Post Office's decision to sell used jeeps and their failure to warn that jeeps of this kind have a tendency to turn over. The Post Office felt no warnings were necessary if the jeeps were used for their "intended and actual use". *Id.*, at 467. The distinguishing characteristic of *Ford* is that the Post Office had studies conducted with respect to the jeeps' susceptibility to turning over. In the cases at bar, several of the forest officials testified that the alligator involved in this attack had lost his fear of man. Therefore, Defendant consciously disregarded a known risk by failing to take any steps whatsoever to protect users of the swimming area.

Based on the authority cited hereinbefore, it is the opinion of this Court that

no reasonable range of choices existed as to the failure to take some action and, thus, the discretionary function exception is inapplicable. 28 U.S.C. § 1346(b) provides:

> "Subject to the provisions of Chapter 171 [discretionary function exception] of this title, the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, * * * for injury * * * or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

In this Court's opinion, the fact that the Government chose not to guard or warn of the alligator(s) does not invoke the protection of § 2680(a). Based on the evidence presented to this Court, no element of choice was presented when the Government failed to remove or warn of the presence of alligator(s) in the swimming area. Thus, § 2680(a) does not apply. Since the danger presented by the reptile(s) was known by the forest officials, there was no discretion to fail to take any remedial measures. Surely, it cannot be contended that the forest officials had discretion to decide whether overriding policy considerations of protecting the alligator(s) and the natural state of the area outweighed the safety of humans using the designated swimming area. Despite the fact that regulations were in place to not only protect the alligator(s), which at the time of this incident were on the endangered species list, but to also preserve the natural state of the park, this Court finds that the existence of such does not invoke the protection of § 2680 in derogation of the rights of humans.

█ Irrespective of the existence of such regulation and the interpretation thereof, it cannot be gainsaid that the Government, the same as a private individual, is under a duty to protect others from hidden dangers they are unaware of when such dangers pose a significant risk of serious bodily injury or death. Thus, no choice presented itself to the forest officials as to whether or not to take remedial measures to protect the individuals using the area.

█ This Court concedes that the decisions of whether to have a swimming area and what measures to take to protect individuals once the alligator problem arose were vested within the sound discretion of the Forest Service and, thus, protected from "judicial second-guessing" by § 2680. However, the decision to do nothing in spite of the known danger was not an option, in this Court's opinion, the Forest Service had available to them. To contend that the decision to do nothing was discretionary because the Forest Service was under an affirmative duty to protect the alligator(s) and the scenic beauty of the park is ludicrous. If this Court were to hold that the discretionary function exception barred Plaintiffs' suits, it would, in effect, be elevating the well-being of an alligator to a level deserving more protection than that of a human. The park was obviously built to provide a recreational area for those desiring to use such, not as a wildlife habitat where the safety of humans through their incidental use takes a back seat to the viewing of reptiles in their natural habitat. If the Forest Service were desirous of this result, it would not have created the recreational areas. The decision to do so was discretionary, but once the decision was made, the Forest Service was under a duty to act reasonably for protection of humans, particularly against hidden dangers known to the Service. Failing such standard, the Government is liable to Plaintiffs in the cases at bar. Accordingly, it is the opinion of this Court that no reasonable range of choices existed with respect to the Forest Service's inaction, and, as such, the discretionary function doctrine of 28 U.S.C. § 2680(a) is inapplicable.

Alternatively, assuming *arguendo* that the Forest Service was presented with a choice of whether or not to take any action with respect to the alligator problem, this Court is of the opinion that such choice was not one which Congress intended to be shielded from liability by virtue of § 2680(a). Thus, assuming that the first

part of the *Berkovitz* test is met—that being a finding that the decision to take no action was a matter of permissible choice—this Court must determine whether Congress intended to shield such decision from liability. For the reasons set forth hereinabove, this Court is of the opinion that Congress did not intend to shield such Forest Service decisions from liability. If Congress intended a decision such as the one made in these cases to be shielded from liability, then the Act would, for all practical purposes, be a nullity. As correctly pointed out in *Denham, supra,* 834 F.2d at 521, "[T]here are discretionary elements in all decisions". If Congress intended to protect every such decision, then virtually every plaintiff who has the misfortune of being injured by governmental negligence or wrongdoing will be left without a forum to redress the wrong. The decision to not at least warn the intended beneficiaries of the government-provided recreation area of the presence of large alligators in the swimming area (assuming there was a possible choice involved) was not one which this Court believes Congress intended to shield from liability by virtue of 28 U.S.C. § 2680(a). Section 1346(b) serves important functions both as a check on the actions of Government and as a means to compel the Government to act reasonably in the conduct of its affairs. To expand the definition of § 2680(a) to include the present situation would render § 1346(b) and the Act useless and, thus, leave these Plaintiffs without a remedy. Therefore, it is the opinion of this Court that Congress did not intend to shield a decision such as the one made in the present cases by Forest Service officials from liability. Therefore, this Court finds that the Government's discretionary function defense must fail.

 RECREATIONAL USE STATUTE. Defendant's second renewed argument involves both articles of the Alabama Recreational Use Statute. See CODE OF ALABAMA [1975], §§ 35–15–1, *et seq.;* CODE OF ALABAMA [1975], §§ 35–15–20, *et seq.* The parties have stipulated that the alligator involved in the attack on Mr. George was not introduced into the Open Pond area by Forest Service officials. Based on this evidence, Defendant argues that it is entitled to judgment in its favor because there was no "willful or malicious failure to guard or warn against a dangerous condition" as required by CODE OF ALABAMA [1975], § 35–15–3. However, Article 2 passed in 1981 by the Alabama Legislature provides, in pertinent part:

"(a) Nothing in this article limits in any way legal liability which otherwise might exist when such owner has actual knowledge:

"(1) That the outdoor recreational land is being used for non-commercial recreational purposes;

"(2) That a condition, use, structure, or activity exists which involves an unreasonable risk of death or serious bodily harm;

"(3) That the condition, use, structure, or activity is not apparent to the person or persons using the outdoor recreational land; and

"(4) That having this knowledge, the owner chooses not to guard or warn, in disregard of the possible consequences.

"(b) The test set forth in subsection (a) of this section shall exclude constructive knowledge by the owner as a basis of liability and does not create a duty to inspect the outdoor recreational land.

"(c) Nothing in this article shall be construed to create or expand any duty or ground of liability or cause of action for injury to persons or property." CODE OF ALABAMA [1975], § 35–15–24.

Thus, the relevant inquiry becomes whether the willful and malicious requirements of § 35–15–3 were intended by the Legislature to be judicially engrafted onto § 35–15–24. This Court has previously ruled, in denying Defendant's Motion for Summary Judgment on this issue, that it would not undertake such a construction as to do so would violate the plain meaning of the statute. See Order of this Court dated September 11, 1989. Defendant now urges this Court to reconsider its previous ruling. Despite some language in *Grice v. City of Dothan,* 670 F.Supp. 318 (M.D.Ala.1987);

*Clark v. TVA*, 606 F.Supp. 130 (N.D.Ala. 1985); *Poole v. City of Gadsden*, 541 So.2d 510 (Ala.1989), which indicates that both articles are to be construed together and that Article 2 was drafted to afford more protection to landowners than Article 1, this Court is still of the firm belief that the Legislature did not intend to further restrict the plain meaning of § 35–15–24 by imposing the willful or malicious standard upon this section. While there appears to be no Alabama authority which has expressly addressed this issue, this Court is of the opinion that the elements of § 35–15–24 are clear and are to be applied to the instant cases as written. The additional protection afforded by Article 2 arises from §§ 35–15–22 and 35–15–23 and not § 35–15–24. Defendant argues that, by enforcing § 35–15–24 as written, this Court is creating a duty of the landowner which otherwise would not exist. This Court cannot agree. The Alabama Legislature created that duty by the passage of § 35–15–24, not this Court. Despite language in Articles 1 and 2 that provides a landowner owes no duty to those using his land for noncommercial recreational purposes, the plain language of § 35–15–24 states that existing liability is not limited when the elements of this section are met. Accordingly, this Court finds that § 35–15–24 does not require a willful or malicious act on the part of the landowner in order for liability to attach. Additionally, this Court finds the presence of the alligator which attacked Mr. George constituted a condition that "involve[d] an unreasonable risk of death or serious bodily harm" [CODE OF ALABAMA (1975), § 35–15–24(a)(2) ]. Furthermore, this Court finds that such condition was not apparent to Mr. George and that the Government had *actual knowledge* of the alligator or of the facts that he was large and had lost his natural fear of humans and was, therefore, dangerous. Yet, they failed "to guard or warn, in disregard of the possible consequences." CODE OF ALABAMA [1975], § 35–15–25(a)(4). Therefore, based on these findings, Defen-

dant's defense predicated on the Alabama Recreational Use Statute must fail.**

CONTRIBUTORY NEGLIGENCE. Defendant's final arguments in support of a finding in its favor concern two separate and independent contentions of contributory negligence on the part of Mr. George. Defendant's first contention is that Mr. George was aware of the presence of alligator(s) in Open Pond and, thus, assumed the risk of injury when he entered the swimming area. Defendant's second theory of contributory negligence arises from Mr. George's failure to have his dog on a leash while in the park which, thus, allowed the dog to precede Mr. George into the swimming area. Defendant contends that the presence of the dog attracted the alligator into the swimming area. This Court is of the opinion that both of Defendant's contentions are without merit.

■ Mr. George testified that he knew alligators were present in Open Pond but that he was unaware that there were any the size of the reptile that took his arm. This Court finds by a preponderance of the evidence that Mr. George was not aware that an alligator approximately 11 feet in length inhabited the Open Pond waters. Furthermore, this Court finds that Mr. George had no knowledge of the danger presented by his entering the swimming area. Thus, this Court finds that Mr. George did not assume the risk of his injury by entering the swimming area on July 26, 1986, notwithstanding his knowledge of the presence of alligators in Open Pond.

■ As briefly set forth previously, Defendant's second theory of contributory negligence arises from the fact that Mr. George violated park regulations by allowing his unleashed dog to accompany him into the park on the occasion in question. The asserted contributory negligence is that Mr. George violated the National Park's leash law and that this violation was a proximate cause of the loss of his arm and related damages. The fact that Mr. George's dog violated regulations by being unleashed is and was of little interest to

** See Appendix B.

this Court or to the subject alligator. It may be speculated that the dog's presence lured the alligator to Mr. George. There is some evidence that alligators are known to enjoy dog meat, but the preponderance of the evidence shows that alligators are not discriminatory in their tastes and are well known to dine on whatever is convenient. The presence in this alligator's stomach of fish stringers, a broken bottle neck and a pine cone is ample evidence that, had the dog been convenient, the leash would not have interfered with the alligator's breakfast, whether or not this particular alligator had a preference for dog meat. This Court finds that the fact, that Mr. George violated park regulations by not keeping his dog on a leash in the park, was not a proximate or contributing cause to his injuries and damages.

Therefore, this Court finds that the Government is liable to the Plaintiffs. An Order will be entered in accordance with this Opinion.

## APPENDIX A

In this Court's previous Opinion dated March 2, 1990, the Court addressed a particular regulation contained in the Forest Service Manual [hereinafter Manual]. While the parties did not raise this issue at trial, the matter is now properly before the Court based on Defendant's renewal of its previously filed motions for summary judgment.

Specifically, the regulation in question provided that the Service must:

"If possible, correct known natural hazards when a site is developed and opened for public use. If it is not possible to remove the hazard, take immediate steps to protect the public from the hazard. Tailor the action taken to each hazardous situation. Post signs or other notices at a minimum. Consider installing barriers or closing the site altogether to ensure public safety." Manual, § 2332.12.

As discussed in the text of this Opinion, "the discretionary function exception [does] not apply when a federal statute, regulation or policy specifically prescribes a cause of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive * * *." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958. While Defendant contended in brief that the Manual, § 2332.12, required the posting of signs as a last resort and only in exceptional circumstances, this Court cannot agree. This Court interprets the regulation as requiring the Government [Forest Service] to, *at a minimum*, post signs to protect the public from the hazard. Therefore, in light of § 2332.12, this Court is of the opinion that no discretion existed due to what this Court deems to be the clear directive of the regulation and the action to be taken pursuant thereto. Additionally, it is interesting to note that Defendant contends that Mr. George was contributorily negligent in failing to heed signs that required him to have his dog on a leash while in the park. Obviously, § 2332.12 did not discourage forest officials from posting signs as to animals in the park. Accordingly, this Court finds the Government's interpretation of said section untenable. The forest officials simply failed to abide by their own regulations and, thus, the discretionary function exception should be wholly inapplicable.

## APPENDIX B

Alternatively, this Court finds that, to the extent § 35–15–24 conflicts with § 35–15–3, if at all, § 35–15–24 repeals § 35–15–3. Article 2, as passed by the Legislature in 1981, contained a provision which provided that, "All laws or parts of laws in conflict with this Act are hereby expressly repealed." [Acts of Alabama 1981, No. 81–825, p. 1468, § 11]. However, this provision was not included in Article 2 as is now codified in the Alabama Code. As appears from the language contained in the CODE, Article 2 and, more specifically, § 35–15–24(a) only create an exception to the provisions of Article 2 and not Article 1 [§§ 35–15–1, *et seq.*]. Section 35–15–22 provides that (except as provided in § 35–15–24) landowners of outdoor recreational land permitting noncommercial public recreational use thereof have no duty of care to the users. Section 35–15–24 (adopted in 1981) then sets out the duty of care that is owed such users of such land, that is, if the owner has actual knowledge

of the following: (1) that the land was being so used; (2) that the activity involves an unreasonable risk of death or serious bodily harm; (3) that said condition (apparently the risk) is not apparent to the user; and (4) that the owner chooses not to guard or warn in disregard of possible consequences, the owner may be liable. Section 35–15–3 (adopted in 1965) had limited liability of similar owners of similar lands to willful or malicious failure to guard or warn. This Court finds that, to the extent that § 35–15–24 is inconsistent with prior interpretations of § 35–15–3, the cause of action described in Subsection 24 is controlling.* Additionally, it is a basic tenet of statutory construction that, when two statutes are in conflict, the last one enacted will govern. *See* 82 C.J.S., *Statutes*, § 291 (1953). Accordingly, this Court finds that, to the extent § 35–15–24 conflicts with § 35–15–3, § 35–15–24 controls and, as such, there is no requirement that a landowner act willfully or maliciously before liability will attach, assuming the requirements of § 35–15–24 have otherwise been satisfied.

---

* The distinction between the two seems to involve ambiguity in use of the word "willful". While the courts read into the word an intent to do an act and thereby cause damage or injury, the Legislature sought to clarify that their definition involved only an intent to do, or fail to do, an act knowing that it involved unreasonable risk. The Legislature, apparently, recognized the impossibility of doing an act as an element of a cause of action for failing to do an act.