The issue in this case is whether the owner of a man-made lake who permitted families to use the lake for recreational purposes upon the payment of a $50.00 fee was, as a matter of law, operating a "commercial enterprise for profit" within the meaning of Ala. Code 1975, §§ 35-15-1 through -5, and 35-15-20
through -28, (hereinafter referred to as the Alabama recreational use statute).
This is a wrongful death action. Valerie Donnel Grant, a minor, drowned in Big Foot Lake, a man-made lake near Atmore in Escambia County, Alabama. That lake was not originally designed for any recreational purpose, but was used initially by the appellant, T.O. Owens, as part of a gravel production business. Gravel was removed from the ground in the area in 1984 and was moved to an adjacent piece of property, and the resulting large gravel pit filled with water of sufficient quality for fishing, boating, and swimming.
In 1986, Owens opened his property to members of the public for recreational use, provided they purchased a written permit, which stated: "BIG FOOT LAKE — It is fully understood that by accepting this permit I do not hold the land owner responsible for any type of accident." A total of 42 permits were issued for $50 each per family.[1]
On July 19, 1986, Grant and three other teenage girls went to Big Foot Lake. The evidence tends to show that two of the girls waded out far enough on a shallow ledge to cause some loose gravel to give way, thereby causing them to slip into deeper water, from which they could not *Page 708 
swim or climb out. In an attempt to rescue the two girls, Grant jumped in to rescue them, but she drowned, along with the two girls.
Valerie's father, Donald Grant, as administrator of the estate, sued Owens, alleging negligence and wantonness in the maintenance of the lake.
At trial, Owens moved for a directed verdict pursuant to § 35-15-1 et seq.; those sections limit the liability of private owners who make their premises available to the public for recreational use, and in pertinent part provide:
"§ 35-15-20. Legislative intent.
 "It is hereby declared that there is a need for outdoor recreational areas in this state which are open for public use and enjoyment; that the use and maintenance of these areas will provide beauty and openness for the benefit of the public and also assist in preserving the health, safety, and welfare of the population; that it is in the public interest to encourage owners of land to make such areas available to the public for non-commercial recreational purposes by limiting such owners' liability towards persons entering thereon for such purposes; that such limitation on liability would encourage owners of land to allow non-commercial public recreational use of land which would not otherwise be open to the public, thereby reducing state expenditures needed to provide such areas.
"§ 35-15-21. Definitions.
 "Unless the context thereof clearly indicates to the contrary, as used in this article the following terms shall have the following meanings:
 "(1) OWNER. Any public or private organization of any character, including a partnership, corporation, association, any individual, or any federal, State or local political subdivision or any agency of any of the foregoing having a legal right of possession of outdoor recreational land. For the purpose of this article, an employee or agent of the owner, but not an independent contractor while conducting activities upon the outdoor recreational land, is deemed to be an owner.
 "(2) OUTDOOR RECREATIONAL LAND. Land and water, as well as buildings, structures, machinery and other such appurtenances used for or susceptible of recreational use.
 "(3) RECREATIONAL USE OR RECREATIONAL PURPOSE. Participation in or viewing of activities including, but not limited to, hunting, fishing, water sports, aerial sports, hiking, camping, picnicking, winter sports, animal or vehicular riding, or visiting, viewing or enjoying historical, archeological, scenic or scientific sites, and any related activity.
 "(4) PERSON. Any individual, regardless of age, maturity, or experience.
 "(5) COMMERCIAL RECREATIONAL USE. Any use of land for the purpose of receiving consideration for opening such land to recreational use where such use or activity is profit-motivated. Consideration does not include any benefits provided by law in accordance with this article, any other state or federal law, or in the form of good will for permitting recreational use as stated in this article; nor does consideration include a charge by the landowner for maintenance fees where the primary use of the land is for other than public recreational purposes.
"§ 35-15-22. Inspection and warning not required.
 "Except as specifically recognized by or provided in this article, an owner of outdoor recreational land who permits non-commercial public recreational use of such land owes no duty of care to inspect or keep such land safe for entry or use by any person for any recreational purpose, or to give warning of a dangerous condition, use, structure, or activity on such land to persons entering for such purposes.
 "§ 35-15-23. Limitations on legal liability of owner.
 "Except as expressly provided in this article, an owner of outdoor recreational land who either invites or permits noncommercial public recreational use of such land does not by invitation or permission thereby: *Page 709 
 "(1) Extend any assurance that the outdoor recreational land is safe for any purpose;
 "(2) Assume responsibility for or incur legal liability for any injury to the person or property owned or controlled by a person as a result of the entry on or use of such land by such person for any recreational purpose; or
 "(3) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.
". . . .
 "§ 35-15-24. Otherwise existing liability not limited.
 "(a) Nothing in this article limits in any way legal liability which otherwise might exist when such owner has actual knowledge:
 "(1) That the outdoor recreational land is being used for non-commercial recreational purposes;
 "(2) That a condition, use, structure, or activity exists which involves an unreasonable risk of death or serious bodily harm;
 "(3) That the condition, use, structure, or activity is not apparent to the person or persons using the outdoor recreational land; and
 "(4) That having this knowledge, the owner chooses not to guard or warn, in disregard of the possible consequence.
 "(b) The test set forth in subsection (a) of this section shall exclude constructive knowledge by the owner as a basis of liability and does not create a duty to inspect the outdoor recreational land.
 "(c) Nothing in this article shall be construed to create or expand any duty or ground of liability or cause of action for injury to persons on property."
The trial court denied the defendant's motion for a directed verdict and refused to instruct the jury regarding this statute.
The trial transcript shows that the court engaged in a colloquy with counsel for plaintiff and defendant concerning the interpretation of the statute, but that colloquy did not adequately analyze the issue of what was meant by the legislature when it used the words "commercial enterprise for profit" in § 35-15-3.
"THE COURT: This is a commercial enterprise?
 "MR. GODWIN: [Grant's attorney] Yes, sir. Are you talking about the pit here?
"THE COURT: Yes, sir.
"MR. GODWIN: Absolutely[,] Your Honor.
 "THE COURT: You are saying [§] 35-15-1 does not provide for a commercial use?
 "MR. GODWIN: That's right. Because 35-15-1 says no duty owed except as provided [by] 35-15-3. 35-15-1
refers you to 35-15-3 to speak to the question of liability. Of course 35-15-2 literally says one who gives permission as distinguished from sells permission. And of course the duty itself is embodied in 35-15-3 which clearly says this exemption, this protection does not apply in the case where the property is commercial enterprise for profit and the permission is granted in connection with commercial enterprise for profit. Mr. Owens is making money off these tickets. . . .
"* * * *
 "MR. GILLION: [Owens's attorney] Judge[,] I just want to say that the purpose of 35-15-1 was to change the existing law. The question here becomes what change was made. And I address that to you. What change was made as the Court interprets it?
 "THE COURT: Luckily I don't have to answer all the questions. I just have to make the rulings.
"* * * *
 "MR. GILLION: Does the court intend to charge on 35-15-1 and 1 through 5 at all? We would ask the Court to charge the Jury on the statute.
 "MR. GODWIN: Your Honor[,] we would submit that that would be wrong if there were any charges on a statute that clearly doesn't apply.
 "THE COURT: I'm going to rule that it does not apply so that you all will know where you stand on that."
The court instructed the jury on negligence and wantonness as set forth in Restatement (Second) of Torts § 339 (1986), *Page 710 
and the jury returned a verdict in the amount of $125,000 against Owens.
It is apparent from the record that the court was of the opinion that no jury question was presented on the applicability of the statute.
Owens argues, among other things, that the trial court erred, at least in refusing to instruct the jury concerning the fact questions regarding whether the activity at Big Foot Lake was "profit motivated." We agree with Owens's argument that the court should have submitted to the jury the fact questions regarding whether granting to the public the right to enter his property for recreational purposes for a fee constituted the operation of a "commercial enterprise for profit" within the meaning of the statute.
Although Alabama's recreational use statute has been in effect since 1975, there have been few cases interpreting it. The key to this case lies in the interpretation of the term "profit-motivated," which is contained in § 35-15-21(5). No case law in Alabama has construed this particular portion of the statute; therefore, we must determine what the legislature intended by using this language. To do so, we must look to the history and public policy behind the statute.
The Alabama statute, passed in 1975, and later amended in 1981, in large part, parallels a model act promulgated over 25 years ago by the Council of State Governments and entitled "Public recreation on private lands: limitations on liability."
The relevant portions of the model act are as follows:
 "Section 4. Except as specifically recognized by or provided in Section 6 of this act, an owner of land who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby:
 "(a) Extend any assurance that the premises are safe for any purpose.
 "(b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.
 "(c) Assume responsibility for or incur liability for any injury to person or property caused by an act or omission on such premises."
24 Suggested State Legislation 150 (Council of State Governments, 1965) (emphasis added).
Currently, 43 states have adopted the model act to some extent.
Generally, the purpose of recreational use legislation, as expressed in the preambles of many of the statutes, is to encourage owners of private lands to make their land available to the public for recreational purposes. The concept is that such legislation provides a type of "quid pro quo" whereby a landowner receives immunity from lawsuits in exchange for opening his land to the public. The preamble in Alabama's recreational statutes contains the purpose behind the adoption of these statutes. It reads:
 "It is hereby declared that there is a need for outdoor recreational areas in this state which are open for public use and enjoyment; that the use and maintenance of these areas will provide beauty and openness for the benefit of the public and also assist in preserving the health, safety, and welfare of the population; that it is in the public interest to encourage owners of land to make such areas available to the public for non-commercial recreational purposes by limiting such owners' liability towards persons entering thereon for such purposes; that such limitation on liability would encourage owners of land to allow non-commercial public recreational use of land which would not otherwise be open to the public, thereby reducing state expenditures needed to provide such areas."
Section 35-15-20 (Supp. 1982).
While a majority of the other states have adopted the model statute verbatim and therefore do not grant immunity from suit if the landowner opens his land for a "charge" (see model statute, § 4), Alabama and Louisiana did not adopt the model act. Alabama and Louisiana deny recovery only if the activity is "profit motivated." Because of the similarity between the Alabama and Louisiana statutes, and in view of the fact that Louisiana has addressed the same question we have before us, we look to the law of Louisiana for guidance. *Page 711 
The Louisiana statute reads, in relevant part, as follows:
 "B. (1) Except for willful or malicious failure to warn against a dangerous condition, use, structure, or activity, an owner of land, except an owner of commercial recreational developments or facilities, who permits with or without charge any person to use his and for recreational purposes as herein defined does not thereby:
 "(a) Extend any assurance that the premises are safe for purposes.
 "(b) Constitute such person the legal status of an invitee or licensee to whom a duty of care is owed.
 "(c) Incur liability for any injury to person or property incurred by such person."
La.Rev.Stat.Ann. § 9:2795 (West 1975) (emphasis added).
The Louisiana Court of Appeals resolved the ambiguities in the phrase "commercial recreational developments" and held that within the intendment of the statute, a "commercial recreational development" is one that is "run for profit."Thomas v. Jeane, 411 So.2d 744 (La.App. 1982); Pratt v. State,408 So.2d 336 (La.App. 1982). In both of those cases the plaintiff paid a fee to enter the recreational area. Acknowledging this, the court specifically held that charging fees would not, in and of itself, render an operation commercial: "[P]rofit as a primary objective of the venture would be essential to render it commercial." 411 So.2d at 747;408 So.2d at 342.
Other states define "charge" or related terms from a negative perspective. For example, Wisconsin's statute provides:
 " 'Valuable consideration' does not include contributions to the sound management and husbandry of natural resources of the state resulting directly from recreational activity, payments to landowners either in money or in kind, if the total payments do not have an aggregate value in excess of $150 annually, or those entrance fees paid to the state . . ."
Wis.Stat. § 29.68 (1979).
Wisconsin is the only state, insofar as our research shows, that specifies a certain dollar amount to meet the consideration requirement.
While the Alabama statute generally parallels the model act, it clearly embraces a different approach when a fee is charged, as in this case. It does not specifically require a gratuitous entry, as the model statute does; in fact, the legislature specified that charging a "maintenance fee" would not exclude a landowner from the protection of the statute. § 35-15-21(5). Federal courts in Alabama that have interpreted Alabama's statute have held that the statutory immunity applied, regardless of whether an admission fee was charged or not.George v. United States, 735 F. Supp. 1524 (M.D.Ala. 1990);Clark v. Tennessee Valley Authority, 606 F. Supp. 130 (N.D.Ala. 1985); and Russell v. Tennessee Valley Authority, 564 F. Supp. 1043
(N.D.Ala. 1983).
Alabama's statute does not follow the Louisiana statute in specifying that the charging of fees does not render the facility a commercial venture, see La.Rev.Stat.Ann. § 9:2795
(1975), and our legislature did not specify a dollar amount that would necessarily constitute a commercial use, as the Wisconsin legislature did, but rather our legislature used the term "profit-motivated." What did the legislature intend by adopting the term "profit-motivated"?
In answering this question, we are aided by a decision of this Court written by Chief Justice Brickell interpreting the phrase "carrying on a business for profit," which was contained in a legislative enactment. In Weil v. State, 52 Ala. 19, 21
(1875), this Court stated:
 "The true inquiry is, and one which a jury will seldom fail correctly to solve, what was the intent of the party? Was it to derive a profit, or the means of livelihood from retailing, or from any of the other occupations mentioned in the statute? If it was, he is guilty; if it was not, he should not be convicted. Whether actual profit is derived from the acts imputed to the defendant, and which are supposed to be evidence of his having *Page 712 
engaged in, or carried on a business, is not a material inquiry. There is no business which may not be so conducted as not to yield a profit. The inquiry is, was it the purpose to derive profit?"
The application of the recreational use statute cannot be decided simplistically on the basis of whether the use of the property was totally gratuitous. In view of the history of the statute and its prior interpretation, we cannot accept the appellee's argument that, as a matter of law, the statute does not apply. If, after a trial, the factfinder determines that the appellant intended to derive a profit from the recreational use of the lake, then the recreational use statute would not protect him. If, however, the factfinder determines that he did not intend to derive a profit, then the immunity provisions of the statute would apply.
We hold, therefore, that it is a jury question whether the appellant intended to derive a profit from the operation of Big Foot Lake. We cannot say that, as a matter of law, that operation is a commercial recreational use of his property.
Under the facts of this particular case, we believe that there is a material question of fact as to whether the appellant intended to derive a profit from the operation of Big Foot Lake. Even though the manmade lake had a name, and was connected with the gravel pit operation, and the recreational users used the same entrance to the lake as did those carrying on business related to the gravel pit operations, we cannot determine, as a matter of law, that the appellant intended to make a profit on the recreational operation.
We hold, therefore, that the trial court erred by refusing to instruct the jury on the applicable statute. Consequently, we reverse the judgment of the trial court and remand the cause for a new trial.
REVERSED AND REMANDED.
JONES, ALMON, ADAMS and STEAGALL, JJ., concur.
[1] The deceased minor had permission to be on the premises because her grandmother had an agreement with Owens that granted Owens an easement across her property for access to his property. Owens paid the grandmother $300 per year for use of the easement and gave the grandmother and her "family" unlimited use of his lake property, in return for use of the easement.