Rel: December 20, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of Southern Reporter. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in Southern Reporter.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2024-2025

———————————————

### SC-2023-0720

———————————————

## Ex parte The Public Parks and Recreation Board of the City of Scottsboro

## PETITION FOR WRIT OF MANDAMUS

## (In re: Karon Patrick

## v.

## The Public Parks and Recreation Board of the City of Scottsboro et al.)

## (Jackson Circuit Court, CV-20-900182)

PER CURIAM.

The Public Parks and Recreation Board of the City of Scottsboro

("the Board"), which operates a public park commonly known as Goose

Pond Colony, petitions this Court for a writ of mandamus directing the Jackson Circuit Court to vacate its order denying the Board's motion for a summary judgment and its order denying the Board's motion to reconsider and to enter a summary judgment for the Board based on the liability protections or immunity provided by Alabama's recreational-use statutes, § 35-15-1 et seq. and § 35-15-20 et seq., Ala. Code 1975. We grant the petition and issue the writ.

Facts and Procedural History

On December 10, 2020, Karon Patrick filed a complaint in the Jackson Circuit Court against the Board, the City of Scottsboro, and various fictitiously named defendants. Regarding the facts of the case, she alleged:

"On or about December 22, 2018, Plaintiff was a business invitee of the Defendants, [the Board] and the CITY OF SCOTTSBORO by virtue of the Plaintiff and several of her family members paying [the Board] and/or the City of Scottsboro a significant sum of money to rent the Goose Pond Lodge situated on the Defendants' real property.

"… On December 22, 2018, at the site and on the premises of the Goose Pond Lodge, Plaintiff was caused to suffer serious physical injury when she tripped, stumbled and fell, chin and face-first, onto a concrete and/or asphalt surface on the parking lot side of the Goose Pond Lodge. The Plaintiff's primary injuries were a dislocated jaw, bilateral mandibular subcondylar fractures, broken and chipped teeth,

2

skin abrasions and bruises. The Plaintiff's tripping, stumbling, falling and serious physical injuries were directly and/or proximately caused by the singular or combining and concurring negligent, wanton, willful, and/or reckless acts and/or omissions of the Defendants."

The complaint stated claims of negligence, negligent design and construction, and negligent supervision.

On January 11, 2021, the Board and the City filed an answer in which they denied the allegations that were included in the complaint and raised affirmative defenses. They specifically raised, in relevant part, "the recreational immunity statute, pursuant to § 35-15-1, et seq and/or § 35-15-20, et seq, Code of Alabama (1975)."

On January 17, 2023, the Board filed a motion for a summary judgment, a brief in support thereof, and supporting evidence. It argued that its liability was limited under Alabama's recreational-use statutes -- §§ 35-15-1 through -5, Ala. Code 1975 ("Article 1"), and §§ 35-15-20 through -28, Ala. Code 1975 ("Article 2"). Initially, the Board argued that the Goose Pond Colony was established for recreational purposes as contemplated by the recreational-use statutes. Next, it argued that Goose Pond Colony is noncommercial recreational land and that the parking lot is the type of appurtenance contemplated by § 35-15-21(2),

3

Ala. Code 1975. The Board also argued that, even though it received income from Patrick for room rentals at a resort lodge located at Goose Pond Colony, it did not operate the lodge for profit so as to fall outside of the liability protections of the recreational-use statutes. Citing the provisions of Article 1, it further argued that its liability is limited to willful or malicious conduct. Finally, it argued that Patrick could not establish that the exception to the liability protections provided by the recreational-use statutes, which is set forth in § 35-15-24, Ala. Code 1975, applies in this case. In making those final arguments, the Board argued, among other things, that Patrick could not establish that it, "with actual knowledge of the alleged trip hazard, maliciously and willfully failed to remedy or warn against the dangerous condition."

In support of its motion for a summary judgment, the Board attached an affidavit from Lyle Sosebee, in which Sosebee stated:

> "My name is Lyle Sosebee. I am over the age of nineteen years and have personal knowledge of the facts contained herein. I am the general manager of Goose Pond Colony in Scottsboro, Jackson County, Alabama. Goose Pond Colony is a resort facility owned by the City of Scottsboro, and operated by the Public Park and Recreation Board of the City of Scottsboro.
>
> "The Public Park and Recreation Board was incorporated in 1967 for the purpose of operating a public

4

park now known as Goose Pond Colony. The specific incorporating purpose is set forth in the Certificate of Incorporation of The Public Park and Recreation Board of the City of Scottsboro, a true and correct copy of which is attached hereto as Exhibit '1'. As per the Certificate of Incorporation, Goose Pond Colony operates a golf course, camp ground, restaurants, marina, swimming pool, water craft rentals, fishing accoutrements and lodging facilities. <u>Goose Pond Colony is a not for profit entity, and operates for the benefit of the public</u>. While Goose Pond charges fees for use of its facilities, said fees are used for improvements and maintenance of the park. This is the case for fees charged for use of the Lodge at Goose Pond Colony. Goose Pond Colony operates at a loss at various times, depending upon the cost of ongoing projects and the income generated by admission of the public.

"The Board hired Taylor Home Builders in 2000 to construct the Lodge at Goose Pond Colony. The Lodge consists of six rental rooms that are available to the public upon payment of the required rental fee. The Lodge has its own parking lot for renters to use while visiting. No material changes were made to the parking lot for the Lodge from its initial construction in 2000 until the date of the Plaintiff's accident. Until Mrs. Patrick tripped and fell, no other similar accidents were reported to my office."

The Board also attached to its summary-judgment motion transcripts of the depositions of Patrick, her husband David Patrick, and Glenn Summerford.

In her deposition, Patrick stated that she and her husband had rented three units at the lodge at Goose Pond Colony and that, around noon on December 22, 2018, they had obtained the key to one of the units

5

at the lodge and had gone to check out the facilities. She admitted that, at that time, there were a lot of leaves and debris from trees in the parking lot and that her husband had mentioned the leaves and debris to a maintenance employee when they picked up the key. She also admitted that she and her husband use the walking trails at Goose Pond Colony quite frequently, that the walking trails go in front of and behind the lodge and the parking lot, and that they had seen and walked by the area before.

Patrick stated that, around 6:00 p.m., she and her husband went back to the lodge to take groceries to the unit; that she had a bag in each hand and started walking toward the door to the unit; and that she stepped into "the dip" in the asphalt, tripped over a parking stop, and fell. She also stated that the dip or depression was "probably four to six inches deep" and one or two feet in diameter. Patrick further stated that some of the security lighting was out when she fell. Finally, she stated that there had been a lot of leaves in the dip or depression during the day but that she thought that employees had blown off some or all of the leaves after her husband had mentioned them.

In his deposition, David Patrick stated that much of the area, including where his wife fell, was covered with leaves the first time they went to the lodge on December 22, 2018. He also stated that he thought he and his wife had commented about the mess from the leaves at that time. David admitted that he and his wife were familiar with the area because they had walked on the walking trails that go in front of and behind the lodge and the parking lot. He further testified that they had contacted maintenance staff about a fire alarm in the unit and that, while the maintenance employee was there, he had asked the employee to blow the leaves away from the area. David testified that, when they returned that evening, the leaves had been blown off but the outside lights were not working. After his wife fell, she told him that she had stepped in a dip, fallen forward, caught the curb stop with her toe, and landed on the concrete. Finally, he stated that the dip had since been filled.

In his deposition, Glenn Summerford testified that he has worked in the maintenance department at Goose Pond Colony for about 12 years and that he had been the maintenance supervisor for about 6 or 7 years. He admitted that the security light outside the unit was not working when Patrick fell and that he replaced two bulbs shortly thereafter. He

also admitted that leaves fell in the area of the parking lot at various times, that they blew them off when they saw them collecting there, and that, on the day of Patrick's fall, one of the maintenance staff members had blown them off at a customer's request. Summerford testified that he had known about the depressions in the parking lot since he had started working at Goose Pond Colony; that, to his knowledge, no one had ever complained about them; and that, to his knowledge, no one had ever fallen there while he had worked there. Finally, he further testified that, at some point after Patrick fell, maintenance staff had used some leftover cold-mix asphalt to try to fill in the depressions in the parking lot in front of the lodge.

On August 10, 2023, Patrick filed a response in opposition to the motion for a summary judgment. She argued that the lodge and the adjoining parking lot are not "outdoor recreational land" as defined in § 35-15-21(2), Ala. Code 1975. Specifically, she contended that the lodge is "a standalone facility with one purpose or function: to house paying guests"; that she and her husband had rented three units in the lodge to house family members during the Christmas season; that she and her family had not been entitled to use any of the other recreational facilities

in Goose Pond Colony; and that she had been in the parking lot to deliver groceries, which is not a recreational purpose.

Patrick also argued that the lodge and the adjoining parking lot are not used for a "recreational purpose" as defined in § 35-15-21(3). First, she contended that, because lodging is not expressly included in the definition, it is not a "recreational use" or a "recreational purpose." Next, she contended that no recreational activities were occurring in the parking lot and that her act of delivering the groceries was not a recreational purpose.

Patrick further argued that the lodge and the adjoining parking lot constitute "commercial recreational use" property as defined in § 35-15-21(5). Specifically, she contended that the lodge is a commercial undertaking that is "profit motivated"; that its statement of revenues and expenditures showed that, between October 1, 2018, and September 30, 2019, it had a gross revenue of $520,074 and excess revenue over expense of $283,116; and that, "[a]t least from October 2007 through September 2022, the lodging facilities of Goose Pond Colony never operated at a loss." Patrick also pointed out that Mark Peppers, a member of the Board, had recommended that the Board "review one department each

9

month to determine how increases in profitability can be achieved" and that Summerford had testified that he had made the Board aware that the pool at Goose Pond Colony lost money all the time and that he thought it should be closed down.

In the alternative, Patrick argued that the Board would still be liable based on the exception to the liability protections provided by the recreational-use statutes that is set forth in § 35-15-24. Specifically, she contended that the Board had actual and prior knowledge about the allegedly defective condition in the parking lot, that that condition could cause serious bodily injury, and that the condition did, in fact, cause serious bodily injury to her.

In support of her response, Patrick attached her own affidavit; statements of revenues and expenses for the Board from October 1, 2007, through September 30, 2022; and minutes of the Board's September 29, 2020, meeting.

On August 11, 2023, the Board filed a reply brief in support of its motion for a summary judgment. The Board first responded to Patrick's argument that the lodge is a standalone facility with a singular purpose of housing paying guests. The Board argued that it has the purpose of

10

operating Goose Pond Colony for public, recreational use; that that purpose specifically includes providing "public accommodation facilities," "cabins," "trailer sites," etc.; and that the fact that it charges money for accommodations does not exclude it from the liability protections provided by the recreational-use statutes. The Board also distinguished the facts of this case from those in Ex parte City of Millbrook, 304 So. 3d 202 (Ala. 2020) (plurality opinion), noting that the lodge is immediately adjacent to Lake Guntersville, with a dock available to patrons of the lodge; that the lodge is surrounded by walking trails in Goose Pond Colony; and that patrons of the lodge have full access to all the facilities in Goose Pond Colony, whether or not they choose to use them.

Second, the Board responded to Patrick's argument that the liability protections provided by the recreational-use statutes do not apply to Goose Pond Colony because the lodge has allegedly never operated at a loss. It initially noted that there is a distinction between for-profit entities and not-for-profit and/or nonprofit entities; that simply because the Board makes a profit does not mean it is a commercial enterprise designed for making a profit; and that a nonprofit entity is not precluded from making a profit. Instead, the Board argued that the

pertinent issue is what the nonprofit entity does with the money it makes. In this case, the Board stated, it uses the money derived from the various facilities that charge a fee at Goose Pond Colony to continue the operations of the park, including paying the costs for maintenance and improvements.

Finally, the Board responded to Patrick's arguments regarding § 35-15-24. Specifically, it contended that "the foregoing portions of the recreational statutes … limit the owner and operator of public recreational land to [being liable for only] willful and malicious conduct." It also contended that Patrick had not included any allegation of willful or malicious conduct by the Board. The Board further argued that Patrick had not satisfied her obligation to establish the requirements of § 35-15-24(a)(2), which requires a showing "(2) [t]hat a condition, use, structure, or activity exists which involves an unreasonable risk of death or serious bodily harm," and § 35-15-24(a)(3), which requires a showing "(3) [t]hat the condition, use, structure, or activity is not apparent to the person or persons using the outdoor recreational land." It contended that there was not any evidence demonstrating that the condition of the parking lot was dangerous because the evidence indicated that the

parking lot had been in that condition for many years without a prior mishap; that there was not any evidence demonstrating that the condition of the parking lot was not apparent to Patrick, who had successfully navigated it a few hours earlier that day; and that there was not any evidence demonstrating a willful or malicious intent to injure.

In support of its reply brief, the Board included an affidavit in which Patrick stated:

> "My name is Karon Patrick. I am the Plaintiff in the above-referenced lawsuit. My husband, David, and I rented and signed a Lease Agreement for three units at the Lodge at Goose Pond Colony in December of 2018 to house several of our family members during the Christmas holidays. We paid $1,234.80 to rent the three units at the Lodge. This payment was for the rental and use of the three Lodge units only and did not include privileges or access to any other … Goose Pond Colony paid facilities such as the golf course, campground or pool area.
>
> "On December 22, 2018, we checked into the Lodge and obtained keys to one of the units. We went grocery shopping and returned to the Lodge at approximately 6:00 p.m. When we arrived, [we] exited my car and got grocery bags out of the car. I had a grocery bag in each hand and started walking towards the door of the Lodge when I stepped into a dip or hole in the parking lot which caused me to stumble and fall face-first, hitting my chin on the concrete walkway in front of the car stop. No recreational activities were being conducted or even available in the Lodge parking areas.
>
> "At the time of my fall, at least one of the security lights mounted on the outside of the Lodge near our Unit was not

working and it was dark. I could not see the hole or depression in the pavement. We had been to [the] Lodge earlier that same day to see what type of kitchen items and serving pieces were in the unit and observed a significant amount of leaves, sticks, and debris in the parking lot, including leaves and debris covering or concealing the area around the hole or dip which caused me to stumble and fall. Because of the presence of the leaves and debris, I could not see there was a hole or dip in that area of the parking lot. I was not engaged in any type of recreational activity at the time of my fall, and there were otherwise no such recreational facilities in the Lodge units or the Lodge parking lot.

"After my fall, I was in substantial pain, but thought I would be alright. I decided to consult a friend of ours, Dr. Daniel Ortiz, an ear, nose, and throat surgeon who lived in one of the Goose Pond Colony condominiums just down the street from the Lodge facility. After talking with Dr. Ortiz and after he looked at my mouth and jaw area, he advised me to get an x-ray of my jaw which I did on December 26, 2018. Those x-rays revealed that both sides of my jaw were broken. As a result of the fall, I suffered a dislocated jaw, bilateral mandibular subcondylar fractures, broken and chipped teeth, skin abrasions and bruises. I had to have surgery to have my jaw repaired, my mouth was wired shut, and I was unable to eat solid foods for 6 weeks following the surgery and could only eat liquid foods through a straw."

On August 22, 2023, the trial court denied the Board's motion for a summary judgment. In its order, the court stated:

"This case came before this Court on August 14, 2023 pursuant to the Motion for Summary Judgment filed by the Defendant, The Public Park and Recreation Board of the City of Scottsboro d/b/a Goose Pond Colony.

14

"Upon consideration of the Motion, the pleadings, the evidentiary submissions and briefs filed by the parties (particularly the affidavit testimony of the Plaintiff, Karon Patrick, and the deposition testimony of Defendant's maintenance supervisor, Glenn 'Junior' Summerford), the Court is of the opinion that substantial disputes of material fact exist such that Defendant's Motion is due to be denied in its entirety; and therefore, Defendant's Motion for Summary Judgment is hereby denied. And further, the Court questions, based on certain disputed and undisputed facts, whether the Defendant is entitled to any greater protection from liability based on Alabama's Recreational Use Statutes."

On August 25, 2023, the Board filed a motion to reconsider. It stated that, to the extent that the court's ruling was based on the issue of profitability, it was attaching copies of the Board's meeting minutes from 2007 through 2023. On September 8, 2023, the trial court denied that motion to reconsider. The Board subsequently filed the present petition for a writ of mandamus.

## Standard of Review

"'"While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion for summary judgment grounded on a claim of immunity is reviewable by petition for writ of mandamus." Ex parte Rizk, 791 So. 2d 911, 912 (Ala. 2000). A writ of mandamus is an extraordinary remedy available only when there is: "(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the

15

lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court." Ex parte BOC Group, Inc., 823 So. 2d 1270, 1272 (Ala. 2001).'

"Ex parte Nall, 879 So. 2d 541, 543 (Ala. 2003). Also,

"'whether review of the denial of a summary-judgment motion is by a petition for a writ of mandamus or by permissive appeal, the appellate court's standard of review remains the same. If there is a genuine issue as to any material fact on the question whether the movant is entitled to immunity, then the moving party is not entitled to a summary judgment. Rule 56, Ala. R. Civ. P. In determining whether there is a [genuine issue of] material fact on the question whether the movant is entitled to immunity, courts, both trial and appellate, must view the record in the light most favorable to the nonmoving party, accord the nonmoving party all reasonable favorable inferences from the evidence, and resolve all reasonable doubts against the moving party, considering only the evidence before the trial court at the time it denied the motion for a summary judgment. Ex parte Rizk, 791 So. 2d 911, 912 (Ala. 2000).'

"Ex parte Wood, 852 So. 2d 705, 708 (Ala. 2002).

"'"When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So. 2d 794, 797-98 (Ala. 1989). Evidence is 'substantial' if it is of 'such weight and quality that fair-minded persons in the exercise of impartial judgment can

16

reasonably infer the existence of the fact sought to be proved.' Wright [v. Wright], 654 So. 2d [542,] 543 [(Ala. 1995)] (quoting West v. Founders Life Assurance Co. of Florida, 547 So. 2d 870, 871 (Ala. 1989))."'

"Wilson v. Manning, 880 So. 2d 1101, 1102 (Ala. 2003) (quoting Hobson v. American Cast Iron Pipe Co., 690 So. 2d 341, 344 (Ala. 1997))."

Ex parte City of Montgomery, 272 So. 3d 155, 159 (Ala. 2018).

Discussion

The following provisions of the recreational-use statutes and some decisions discussing these provisions are relevant to our discussion of the arguments raised in the Board's petition.

Section 35-15-1, Ala. Code 1975, provides:

"An owner, lessee, or occupant of premises owes no duty of care to keep such premises safe for entry and use by others for hunting, fishing, trapping, camping, water sports, hiking, boating, sight-seeing, caving, climbing, rappelling, or other recreational purposes or to give any warning of hazardous conditions, use of structures or activities on such premises to persons entering for the above-stated purposes, except as provided in Section 35-15-3."

Section 35-15-2, Ala. Code 1975, provides:

"An owner, lessee, or occupant of premises who gives permission to another to hunt, fish, trap, camp, hike, sight-see, cave, climb, rappel, or engage in other sporting or recreational activities upon such premises does not thereby extend any assurance that the premises are safe for such

17

purpose nor constitute the person to whom permission has been granted the legal status of an invitee to whom a duty of care is owed or assume responsibility for or incur liability for any injury to person or property caused by an act of such person to whom permission has been granted, except as provided in Section 35-15-4."

Section 35-15-3, Ala. Code 1975, provides:

"[Article 1] does not limit the liability which otherwise exists for wilful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity; or for injury suffered in any case where permission to hunt, fish, trap, camp, hike, cave, climb, rappel, or sight-see was granted for commercial enterprise for profit; or for injury caused by acts of persons to whom permission to hunt, fish, trap, camp, hike, or sight-see was granted to third persons as to whom the person granting permission, or the owner, lessee, or occupant of the premises owed a duty to keep the premises safe or to warn of danger."

Section 35-15-4, Ala. Code 1975, provides:

"Nothing in [Article 1] creates a duty of care or ground of liability for injury to person or property."

Section 35-15-5, Ala. Code 1975, provides:

"Nothing in [Article 1] shall be construed as granting or creating a right for any person to go on the lands of another without permission of the landowner."

With regard to the recreational-use statutes, the legislature stated

the following:

"It is hereby declared that there is a need for outdoor recreational areas in this state which are open for public use

18

and enjoyment; that the use and maintenance of these areas will provide beauty and openness for the benefit of the public and also assist in preserving the health, safety, and welfare of the population; that it is in the public interest to encourage owners of land to make such areas available to the public for non-commercial recreational purposes by limiting such owners' liability towards persons entering thereon for such purposes; that such limitation on liability would encourage owners of land to allow non-commercial public recreational use of land which would not otherwise be open to the public, thereby reducing state expenditures needed to provide such areas."

§ 35-15-20, Ala. Code 1975.

Section 35-15-21, Ala. Code 1975, sets forth the following definitions:

"Unless the context thereof clearly indicates to the contrary, as used in [Article 2] the following terms shall have the following meanings:

"(1) Owner. Any public or private organization of any character, including a partnership, corporation, association, any individual, or any federal, state or local political subdivision or any agency of any of the foregoing having a legal right of possession of outdoor recreational land. For the purpose of [Article 2], an employee or agent of the owner, but not an independent contractor while conducting activities upon the outdoor recreational land, is deemed to be an owner.

"(2) Outdoor recreational land. Land and water, as well as buildings, structures, machinery,

19

and other such appurtenances used for or susceptible of recreational use.

"(3) Recreational use or Recreational purpose. Participation in or viewing of activities including, but not limited to, hunting, fishing, water sports, aerial sports, hiking, camping, picnicking, winter sports, animal or vehicular riding, or visiting, viewing or enjoying historical, archeological, scenic, or scientific sites, and any related activity.

"(4) Person. Any individual, regardless of age, maturity, or experience.

"(5) Commercial recreational use. Any use of land for the purpose of receiving consideration for opening such land to recreational use where such use or activity is profit-motivated. Consideration does not include any benefits provided by law in accordance with [Article 2], any other state or federal law, or in the form of good will for permitting recreational use as stated in [Article 2]; nor does consideration include a charge by the landowner for maintenance fees where the primary use of the land is for other than public recreational purposes."

Section 35-15-22, Ala. Code 1975, provides:

"Except as specifically recognized by or provided in [Article 2], an owner of outdoor recreational land who permits non-commercial public recreational use of such land owes no duty of care to inspect or keep such land safe for entry or use by any person for any recreational purpose, or to give warning of a dangerous condition, use, structure, or activity on such land to persons entering for such purposes."

Section 35-15-23, Ala. Code 1975, provides:

"Except as expressly provided in [Article 2], an owner of outdoor recreational land who either invites or permits non-commercial public recreational use of such land does not by invitation or permission thereby:

"(1) Extend any assurance that the outdoor recreational land is safe for any purpose;

"(2) Assume responsibility for or incur legal liability for any injury to the person or property owned or controlled by a person as a result of the entry on or use of such land by such person for any recreational purpose; or

"(3) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed."

Section 35-15-24, Ala. Code 1975, provides, in part:

"(a) Nothing in [Article 2] limits in any way legal liability which otherwise might exist when such owner has actual knowledge:

"(1) That the outdoor recreational land is being used for non-commercial recreational purposes;

"(2) That a condition, use, structure, or activity exists which involves an unreasonable risk of death or serious bodily harm;

"(3) That the condition, use, structure, or activity is not apparent to the person or persons using the outdoor recreational land; and

21

"(4) That having this knowledge, the owner chooses not to guard or warn, in disregard of the possible consequences.

"(b) The test set forth in subsection (a) of this section shall exclude constructive knowledge by the owner as a basis of liability and does not create a duty to inspect the outdoor recreational land."

(Emphasis added.)

Regarding recreational-use statutes and their purpose and scope, courts have stated as follows:

"[Section 35-15-1, Ala. Code 1975,] was enacted 'to insure that landowners were not to be held to a standard of due care toward persons upon their land with permission for hunting, fishing and recreational purposes.' Wright v. Alabama Power Co., 355 So. 2d 322, 324 (Sup. Ct. of Ala. 1978).

"Section 35-15-3 exempts three situations from the limitation in 35-15-1, only one of which could possibly apply here. That exemption is stated as follows:

"'This chapter does not limit the liability which otherwise exists for wilful or malicious failure to guard or warn against a dangerous condition, use, structure or activity....'"

Russell ex rel. Russell v. Tennessee Valley Auth., 564 F. Supp. 1043, 1047 (N.D. Ala. 1983).

"Sections 35-15-1 through 5, Code of Ala. (1975) defines and limits the duties of a recreational land owner in relation to persons using his premises for recreational purposes. Such

22

an owner, whether public or private, owes no duty whatsoever to provide safe premises to users. These statutory provisions recognize only potential liability 'which otherwise exists for <u>willful</u> or <u>malicious</u> failure to guard or warn against a dangerous condition, use, structure or activity ...'. (emphasis supplied).

"....

"Sections 35-15-20 through 28, Code of Ala. (1975) (1984 Supp.) applies to noncommercial public recreational landowners ..., and provides them with even tighter limitations than §§ 35-15-1 through 5, as to their exposure to liability to recreational users. This 1981 piece of legislation recognizes a public policy in Alabama to encourage public owners to allow the opening up and promotion of their facilities without exposing themselves to law suits. This court will not second guess this legislative intent."

<u>Clark v. Tennessee Valley Auth.</u>, 606 F. Supp. 130, 131 (N.D. Ala. 1985).

"[Sections] 35-15-20 through 28, Code of Alabama (1975) (1984 Supp.), further limits the liability of owners of land who dedicate their property for non-commercial recreational use. ... These sections declare that the public policy of Alabama is to encourage the donation of non-commercial recreational property without exposing the owners of such property to liability. As the Court stated in <u>Clark[ v. Tennessee Valley Auth.</u>, 606 F. Supp. 130,] 131 [(N.D. Ala. 1985)], this Court will not question the clear expression of this legislative intent. <u>See</u>, <u>Jennett v. United States</u>, 597 F. Supp. 110 (D. Conn. 1984). This Court finds, as did the Court in <u>Clark</u>, that Articles 1 and 2 of Chapter 15 are to be read complimentary to each other and that the provisions of Article 2 do not repeal the provisions contained in Article 1."

<u>Grice v. City of Dothan</u>, 670 F. Supp. 318, 321 (M.D. Ala. 1987).

Finally,

"[Sections 35-15-20 et seq.], passed by the legislature in 1975 and amended in 1981, limit the tort liability of a private or public owner of land that opens its land for recreational use by the public. That limitation on liability applies only if the use of the land is not a commercial enterprise. <u>Owens v. Grant</u>, 569 So. 2d 707, 710 (Ala. 1990); § 35-15-26. For the purposes of this statute, the term 'owner' includes agents of the owner. § 35-15-21(1). An exception to the limitation on liability is contained in § 35-15-24. Under that section, a landowner that opens its land for noncommercial, public recreational use can be liable for injuries if the owner has <u>actual</u> knowledge that (1) the land is being used for noncommercial recreational purposes; (2) a condition, use, structure, or activity that involves an unreasonable risk of death or serious injury is present on the land; and (3) the dangerous condition, use, structure, or activity is not apparent to members of the public using the land; and if, despite that actual knowledge, the landowner chooses not to guard against injury or warn the public, in disregard of the possible consequences. Section 35-15-24(a)(1)-(4). In order for liability to be imposed under that section, it must be shown that the landowner had actual knowledge of each of the elements listed above and, with that actual knowledge, chose not to guard or warn against the danger. <u>Constructive knowledge is not sufficient.</u> <u>Keenum v. City of Huntsville</u>, 575 So. 2d 1075 (Ala. 1991); § 35-15-24(b)."

<u>Martin ex rel. Martin v. City of Gadsden</u>, 584 So. 2d 796, 797-98 (Ala. 1991) (final emphasis added).

The Board argues that the trial court erred in denying its motion for a summary judgment based on the application of the recreational-use statutes. Specifically, it contends, as it did below, that the lodge and the

parking lot where Patrick fell fall within the definition of "outdoor recreational land" set forth in § 35-15-23(2); that the lodge and the parking lot are used for a recreational use or purpose as set forth in § 35-15-21(3); and that the use of the lodge and the parking lot does not constitute "commercial recreational use" as defined in § 35-15-21(5). In the alternative, it contends, as it did below, that Patrick has not satisfied her burden of establishing all four elements of the exception to the liability protections provided by the recreational-use statutes that is set forth in § 35-15-24(a).

Patrick argues that the trial court did not err in denying the Board's motion for a summary judgment. Specifically, she contends that the lodge and the parking lot are not "outdoor recreational land" as defined in § 35-15-21(2); that use of the lodge and the parking lot does not constitute "recreational use" or a "recreational purpose" as defined in § 35-15-21(3); and that use of the lodge and the parking lot constitutes "commercial recreational use" as defined in § 35-15-21(5). In the alternative, she contends that the Board would still be liable based on the exception to the liability protections provided by the recreational-use statutes that is set forth in § 35-15-24(a).

25

We agree with the Board's arguments. Although Patrick focuses solely on her specific use of the lodge on the date of the accident, it is clear that the Board has the purpose of operating Goose Pond Colony, including the lodge, for public, recreational use and that that purpose specifically includes providing "public accommodation facilities," "cabins," "trailer sites," etc. Nothing in the recreational-use statutes suggests that their liability protections are based on an individual's personal reasons for using the property in question.

In Ex parte City of Millbrook, supra, the plaintiff and her husband sued the City of Millbrook after the plaintiff fell from a sidewalk outside the Millbrook Civic Center ("the civic center"). The City of Millbrook moved for a summary judgment on the ground that it was entitled to immunity pursuant to Article 2 of the recreational-use statutes. The trial court entered an order denying the City of Millbrook's motion, and the City of Millbrook subsequently filed a petition for a writ of mandamus in this Court. In a plurality decision addressing the City of Millbrook's argument that it was entitled to immunity pursuant to Article 2 of the recreational-use statutes, this Court stated:

> "The City argues that it has a clear legal right to relief based on Article 2 of the recreational-use statutes. Article 2

26

is titled 'Limitation of Liability for Non-Commercial Public Recreational Use of Land' and provides:

> "'Except as specifically recognized by or provided in this article, an owner of outdoor recreational land who permits non-commercial public recreational use of such land owes no duty of care to inspect or keep such land safe for entry or use by any person for any recreational purpose, or to give warning of a dangerous condition, use, structure, or activity on such land to persons entering for such purposes.'

"§ 35-15-22, Ala. Code 1975. The City is entitled to this immunity only if the civic center comes within the definition of 'outdoor recreational land' in Article 2. 'Outdoor recreational land' is defined in Article 2 as '[l]and and water, as well as buildings, structures, machinery, and other such appurtenances used for or susceptible of recreational use.' § 35-15-21(2), Ala. Code 1975.

"When determining the meaning of a statute, this Court 'looks to the plain meaning of the words as written by the legislature.' DeKalb Cty. LP Gas Co. v. Suburban Gas, Inc., 729 So. 2d 270, 275 (Ala. 1998). Under our plain-meaning approach:

> "'"'Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"'

"729 So. 2d at 275 (quoting Blue Cross & Blue Shield v. Nielsen, 714 So. 2d 293, 296 (Ala. 1998), quoting in turn

27

IMED Corp. v. Systems Eng'g Assocs., 602 So. 2d 344, 346 (Ala. 1992)). This approach is mandated by the separation-of-powers principles enshrined in the Alabama Constitution. 'To the end that the government of the State of Alabama may be a government of laws and not of individuals, ... the judicial branch may not exercise the legislative or executive power.' Ala. Const. 1901, Art. III, § 42. Adhering to the plain meaning of a statute ensures that this Court complies with its constitutional mandate and discharges its duty of saying what the law is without overstepping its role and legislating from the bench. To stray from the plain meaning of a statute would be to 'turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers.' DeKalb Cty. LP Gas Co., 729 So. 2d at 276.

"Both the City and the Wrights argue their positions based on the plain meaning of Article 2 of the recreational-use statutes. The City emphasizes in its petition that the statutory definition of 'outdoor recreational land' includes both 'buildings' and 'structures,' § 35-15-21(2), and thus, it argues, plainly includes the civic center. The Wrights counter that the civic center is a stand-alone, indoor facility with no connection to outdoor recreation and that Article 2 of the recreational-use statutes is therefore plainly inapplicable. Because fundamental principles of statutory interpretation foreclose the City's reading, we conclude that the Wrights have the better interpretation.

"Taking a plain-meaning approach to a contested question of statutory interpretation is best understood as an exercise in textualism. 'Textualism, in its purest form, begins and ends with what the text says and fairly implies.' Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 16 (Thomson/West 2012). Textualism recognizes that '[a] text should not be construed strictly, and it should not be construed leniently; it should be construed reasonably, to contain all that it fairly means.' Antonin

Scalia, A Matter of Interpretation 23 (Princeton University Press 1997). 'Textualism ... tasks judges with discerning (only) what an ordinary English speaker familiar with the law's usages would have understood the statutory text to mean at the time of its enactment.' Neil Gorsuch, The Case for Textualism, A Republic, If You Can Keep It 128, 131 (Crown Forum 2019). When this Court interprets a statute, it is charged with doing so fairly, giving full effect to the statutory intent as represented in the words enacted by the legislature -- no more and no less.

"A useful textualist tool for giving a full and fair reading to the unambiguous definition of 'outdoor recreational land' in Article 2 of the recreational-use statutes is the associated-words canon of statutory interpretation, also known as the doctrine of noscitur a sociis. Long recognized in Alabama law, '[t]his doctrine provides that "where general and specific words which are capable of an analogous meaning are associated one with the other, they take color from each other, so that the general words are restricted to a sense analogous to that of the less general."' Ex parte Emerald Mountain Expressway Bridge, L.L.C., 856 So. 2d 834, 842-43 (Ala. 2003) (quoting Winner v. Marion Cty. Comm'n, 415 So. 2d 1061, 1064 (Ala. 1982), and citing State v. Western Union Tel. Co., 196 Ala. 570, 72 So. 99 (1916)). The canon has been summarized this way: 'When several [words] ... are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar.' Scalia & Garner, supra, at 195.

"In addition to the phrase 'land and water,' the statutory definition of 'outdoor recreational land' includes a list of associated nouns: 'buildings, structures, machinery, and other such appurtenances used for or susceptible of recreational use.' § 35-15-21(2) (emphasis added). The associated-words canon counsels that the inclusion of the term 'other such appurtenances' in this list of nouns means that the definition

applies only to those buildings, structures, and machinery that are also 'appurtenances.'

"The term 'appurtenance' is not further defined in the recreational-use statutes, but its plain meaning in the context of Article 2 can be quickly grasped by consulting contemporary dictionaries. '[W]hen a term is not defined in a statute, the commonly accepted definition of the term should be applied.' Bean Dredging, L.L.C. v. Alabama Dep't of Revenue, 855 So. 2d 513, 517 (Ala. 2003) (citing Republic Steel Corp. v. Horn, 268 Ala. 279, 105 So. 2d 446, 447 (Ala. 1958)). An 'appurtenance' is defined as 'an accessory or other item associated with a particular activity or style of living,' The New Oxford American Dictionary 76 (2d ed. 2005), 'a subordinate part or adjunct ..., [an] accessory object[],' Merriam-Webster's Collegiate Dictionary 61-62 (11th ed. 2003), and 'a contributory adjunct, an accessory.' The Oxford English Dictionary 590 (2d ed. 1989). An accessory is 'an object or device not essential in itself but adding to the beauty, convenience, or effectiveness of something else.' Merriam-Webster's Collegiate Dictionary 7 (11th ed. 2003). An edition of Black's Law Dictionary published shortly before the enactment of Article 2 provides a thorough definition of 'appurtenance' that helpfully synthesizes the subtleties apparent from the foregoing definitions:

> "'That which belongs to something else; an adjunct; an appendage. Something annexed to another thing more worthy as principal, and which passes as incident to it, as a right of way or other easement to land; an outhouse, barn, garden, or orchard to a house .... An article adapted to the use of the property to which it is connected, and which was intended to be a permanent accession to the freehold.'

"Black's Law Dictionary 94 (5th ed. 1979).

30

"When the associated-words canon is applied while bearing in mind these definitions of 'appurtenance,' the plain meaning of a 'building' in the context of Article 2 of the recreational-use statutes is clear: a 'building' is 'outdoor recreational land' under § 35-15-21(2) only if it is adjunct to land or water and it facilitates the recreational use of that land or water.

"The City has not established that the civic center is the kind of building included in the definition of 'outdoor recreational land.' The City's petition includes no discussion of the relationship of the civic center to the surrounding land or how the civic center facilitates the recreational use of that land. Although the civic center is a 'building' in the general sense of the word, the City does not establish in its petition that the civic center is an appurtenance to land or water covered by Article 2 of the recreational-use statutes. The City thus lacks a clear legal right to a summary judgment in its favor on the basis of the immunity provided in Article 2 of the recreational-use statutes, and its petition is due to be denied."

Ex parte City of Millbrook, 304 So. 3d at 204-07 (footnote omitted).

Unlike the building in Ex parte City of Millbrook, the lodge does not stand alone because it is within Goose Pond Colony, a public park, and it does not host only indoor activities. Instead, the lodge and the parking lot constitute outdoor recreational land because they are adjunct to both land and water, and they facilitate the continued use of both by providing access to walking trails and a dock for fishing and other water activities because they are in the middle of (and part of) a public park and are surrounded by Lake Guntersville on three sides, and enable patrons to

31

access walking trails and a dock.

Moreover, the fact that the lodge charges money for accommodations does not exclude it from the liability protections provided by the recreational-use statutes. With regard to the parties' competing arguments as to whether Goose Pond Colony was used for commercial or noncommercial recreational purposes, we note the following:

"At trial, and on appeal, Tyson has argued that this statutory limitation on liability does not apply because, he says, Noccalula Falls Park is a commercial enterprise. He argues that because the City charges admission fees to some users of the park and because there are 13 income-generating attractions or concessions at the park, it is a commercial enterprise and therefore falls outside the protection extended by the statute. The definition of 'commercial recreational use' is found at § 35-15-21(5):

"'**Commercial Recreational Use**. Any use of land for the purpose of receiving consideration for opening such land to recreational use <u>where such use or activity is profit-motivated</u>....'

"(Emphasis added.) The City produced witnesses who testified that although there are charges for some of the attractions at the park, the park has consistently been operated at a significant loss and has never been envisioned as a profit-producing asset for the City.

"In <u>Owens</u>[v. Grant, 569 So. 2d 707 (Ala. 1990)], this Court was asked to interpret the phrase 'profit-motivated.' In that case, we held that the fact that entry fees were charged

32

by the landowner did not necessarily mean that the use of the land was 'profit-motivated.' 569 So. 2d at 711-12. Instead of adopting a rigid definition of that phrase, this Court decided that the question of whether a landowner intends to derive a profit from the use of its land, thus making it a commercial enterprise, must be decided on a case-by-case basis and is properly within the province of the jury. Id."

Martin, 584 So. 2d at 798 (bold typeface in original).

In Owens v. Grant, 569 So. 2d 707 (Ala. 1990), this Court reasoned

as follows:

"Owens argues, among other things, that the trial court erred, at least in refusing to instruct the jury concerning the fact questions regarding whether the activity at Big Foot Lake was 'profit motivated.' We agree with Owens's argument that the court should have submitted to the jury the fact questions regarding whether granting to the public the right to enter his property for recreational purposes for a fee constituted the operation of a 'commercial enterprise for profit' within the meaning of the statute.

"Although Alabama's recreational use statute has been in effect since 1975, there have been few cases interpreting it. The key to this case lies in the interpretation of the term 'profit-motivated,' which is contained in § 35-15-21(5). No case law in Alabama has construed this particular portion of the statute; therefore, we must determine what the legislature intended by using this language. To do so, we must look to the history and public policy behind the statute.

"The Alabama statute, passed in 1975, and later amended in 1981, in large part, parallels a model act promulgated over 25 years ago by the Council of State Governments and entitled 'Public recreation on private lands: limitations on liability.'

33

"The relevant portions of the model act are as follows:

"'<u>Section 4</u>. Except as specifically recognized by or provided in Section 6 of this act, an owner of land who either directly or indirectly invites or permits <u>without charge</u> any person to use such property for recreational purposes does not thereby:

"'(a) Extend any assurance that the premises are safe for any purpose.

"'(b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.

"'(c) Assume responsibility for or incur liability for any injury to person or property caused by an act or omission on such premises.'

"24 Suggested State Legislation 150 (Council of State Governments, 1965) (emphasis added).

"Currently, 43 states have adopted the model act to some extent.

"Generally, the purpose of recreational use legislation, as expressed in the preambles of many of the statutes, is to encourage owners of private lands to make their land available to the public for recreational purposes. The concept is that such legislation provides a type of 'quid pro quo' whereby a landowner receives immunity from lawsuits in exchange for opening his land to the public. The preamble in Alabama's recreational statutes contains the purpose behind the adoption of these statutes. It reads:

"'It is hereby declared that there is a need for outdoor recreational areas in this state which are open for public use and enjoyment; that the use and maintenance of these areas will provide beauty and openness for the benefit of the public and also assist in preserving the health, safety, and welfare of the population; that it is in the public interest to encourage owners of land to make such areas available to the public for non-commercial recreational purposes by limiting such owners' liability towards persons entering thereon for such purposes; that such limitation on liability would encourage owners of land to allow non-commercial public recreational use of land which would not otherwise be open to the public, thereby reducing state expenditures needed to provide such areas.'

"Section 35-15-20 (Supp.1982).

"While a majority of the other states have adopted the model statute verbatim and therefore do not grant immunity from suit if the landowner opens his land for a 'charge' (see model statute, § 4), Alabama and Louisiana did not adopt the model act. Alabama and Louisiana deny recovery only if the activity is 'profit motivated.' Because of the similarity between the Alabama and Louisiana statutes, and in view of the fact that Louisiana has addressed the same question we have before us, we look to the law of Louisiana for guidance.

"The Louisiana statute reads, in relevant part, as follows:

"'B. (1) Except for willful or malicious failure to warn against a dangerous condition, use, structure, or activity, an owner of land, except <u>an owner of commercial recreational developments or facilities, who permits with or without charge</u> any

35

person to use his land for recreational purposes as herein defined does not thereby:

> " '(a) Extend any assurance that the premises are safe for purposes.

> " '(b) Constitute such person the legal status of an invitee or licensee to whom a duty of care is owed.

> " '(c) Incur liability for any injury to person or property incurred by such person.'

"La. Rev. Stat. Ann. § 9:2795 (West 1975) (emphasis added).

"The Louisiana Court of Appeals resolved the ambiguities in the phrase 'commercial recreational developments' and held that within the intendment of the statute, a 'commercial recreational development' is one that is 'run for profit.' Thomas v. Jeane, 411 So. 2d 744 (La. App. 1982); Pratt v. State, 408 So. 2d 336 (La. App. 1982). In both of those cases the plaintiff paid a fee to enter the recreational area. Acknowledging this, the court specifically held that charging fees would not, in and of itself, render an operation commercial: '[P]rofit as a primary objective of the venture would be essential to render it commercial.' 411 So. 2d at 747; 408 So. 2d at 342.

"Other states define 'charge' or related terms from a negative perspective. For example, Wisconsin's statute provides:

> " ' "Valuable consideration" does not include contributions to the sound management and husbandry of natural resources of the state resulting directly from recreational activity, payments to landowners either in money or in kind, if the total payments do not have an

36

aggregate value in excess of $150 annually, or those entrance fees paid to the state ...'

"Wis. Stat. § 29.68 (1979).

"Wisconsin is the only state, insofar as our research shows, that specifies a certain dollar amount to meet the consideration requirement.

"While the Alabama statute generally parallels the model act, it clearly embraces a different approach when a fee is charged, as in this case. It does not specifically require a gratuitous entry, as the model statute does; in fact, the legislature specified that charging a 'maintenance fee' would not exclude a landowner from the protection of the statute. § 35-15-21(5). Federal courts in Alabama that have interpreted Alabama's statute have held that the statutory immunity applied, regardless of whether an admission fee was charged or not. George v. United States, 735 F. Supp. 1524 (M.D. Ala. 1990); Clark v. Tennessee Valley Authority, 606 F. Supp. 130 (N.D. Ala. 1985); and Russell v. Tennessee Valley Authority, 564 F. Supp. 1043 (N.D. Ala. 1983).

"Alabama's statute does not follow the Louisiana statute in specifying that the charging of fees does not render the facility a commercial venture, see La. Rev. Stat. Ann. § 9:2795 (1975), and our legislature did not specify a dollar amount that would necessarily constitute a commercial use, as the Wisconsin legislature did, but rather our legislature used the term 'profit-motivated.' What did the legislature intend by adopting the term 'profit-motivated'?

"In answering this question, we are aided by a decision of this Court written by Chief Justice Brickell interpreting the phrase 'carrying on a business for profit,' which was contained in a legislative enactment. In Weil v. State, 52 Ala. 19, 21 (1875), this Court stated:

"'The true inquiry is, and one which a jury will seldom fail correctly to solve, what was the intent of the party? Was it to derive a profit, or the means of livelihood from retailing, or from any of the other occupations mentioned in the statute? If it was, he is guilty; if it was not, he should not be convicted. Whether actual profit is derived from the acts imputed to the defendant, and which are supposed to be evidence of his having engaged in, or carried on a business, is not a material inquiry. There is no business which may not be so conducted as not to yield a profit. The inquiry is, was it the purpose to derive profit?'

"The application of the recreational use statute cannot be decided simplistically on the basis of whether the use of the property was totally gratuitous. In view of the history of the statute and its prior interpretation, we cannot accept the appellee's argument that, as a matter of law, the statute does not apply. If, after a trial, the factfinder determines that the appellant intended to derive a profit from the recreational use of the lake, then the recreational use statute would not protect him. If, however, the factfinder determines that he did not intend to derive a profit, then the immunity provisions of the statute would apply."

569 So. 2d at 710-12.

The Board was incorporated pursuant to Act No. 218, Ala. Acts 1967, "for the specific purpose of acquiring a project for a public park including public accommodation facilities" and "for the benefit of the public." Also, the title to Act No. 218 states that the act authorizes the creation of only a "non-profit" corporation and specifically states that

"such corporations shall not be authorized to operate as a commercial enterprise." See also Opinion of the Justices No. 188, 280 Ala. 692, 694, 198 So. 2d 269, 271 (1967) (quoting House Bill No. 217, on which Act No. 218 was apparently based)) (emphasis added). The City expressly used Act No. 218 to incorporate the Board, thus placing these same limits on the Board. Further, § 15 of Act No. 218 authorizing the existence of such "non-profit" corporations -- such as the Board -- also expressly allows such entities to make "net earnings," so long as they are "used to pay the cost of extensions and improvements to any of its projects." Finally, the Board produced sufficient evidence, via the affidavit testimony of its general manager, Lyle Sosebee, that it uses its net earnings from Goose Pond Colony only for maintenance and improvements of its projects. Sosebee testified that "Goose Pond Colony is a not for profit entity, and operates for the benefit of the public," and that "[w]hile Goose Pond charges fees for use of its facilities, said fees are used for improvements and maintenance of the park." Therefore, the Board clearly established that the lodge, which is part of Goose Pond Colony, is not profit-motivated and is not used for commercial recreational purposes so that the recreational-use statutes would not apply.

The Board also argues that the exception to the liability protections provided by the recreational-use statutes set forth in § 35-15-24 does not apply in this case. Specifically, it contends that Patrick did not present substantial evidence establishing that it had actual knowledge of the existence of "a condition … which involves an unreasonable risk of death or serious bodily harm." § 35-15-24(a)(2). In this case, Patrick had the burden of "present[ing] substantial evidence of each element to prove that the exception … applies." Ex parte City of Guntersville, 238 So. 3d 1243, 1247 (Ala. 2017).

It is undisputed that the Board had actual knowledge of the existence of the dip in the parking lot. However, Patrick produced no evidence, much less substantial evidence, indicating that the Board had actual knowledge that the dip presented an "unreasonable risk of death or serious bodily harm." § 35-15-24(a)(2). Although Summerford testified that he had been personally aware of the dip in the parking lot for approximately 12 years, he also testified that he was not aware of any previous trip-and-fall accidents that had occurred in the parking lot. Additionally, Patrick admitted that she had navigated the parking lot earlier that day without any injury. Based on the foregoing, Patrick did

40

not present substantial evidence indicating that the Board had actual knowledge before Patrick's accident that the dip in the parking lot posed an "unreasonable risk of death or serious bodily harm." § 35-15-24(a)(2). Accordingly, Patrick failed to present substantial evidence establishing that the exception in § 35-15-24 applies in this case.

Conclusion

For the above-stated reasons, the Board is entitled to immunity from Patrick's claims against it pursuant to Alabama's recreational-use statutes. Therefore, we grant the petition for a writ of mandamus and direct the trial court to vacate its August 22, 2023, order denying the Board's motion for a summary judgment and to enter an order granting its motion for a summary judgment as to Patrick's claims against it.

PETITION GRANTED; WRIT ISSUED.

Parker, C.J., and Shaw, Wise, Bryan, Mendheim, Stewart, Mitchell, and Cook, JJ., concur.

Sellers, J., concurs specially, with opinion.

SELLERS, Justice (concurring specially).

I concur with the main opinion holding that The Public Parks and Recreation Board of the City of Scottsboro is entitled to a writ of mandamus directing the Jackson Circuit Court to enter a summary judgment in its favor based on Alabama's recreational-use statutes, Ala. Code 1975, §§ 35-15-1 through -5 ("Article 1") and §§ 35-15-20 through -28 ("Article 2"). I write specially to discuss the "wilful or malicious" language contained in Article 1 and, specifically, its omission from the language contained in Article 2.

Article 1 of the recreational-use statutes, enacted in 1965, defines and limits the duties of an owner of land in relation to persons using the owner's land for recreational purposes. Section 35-15-3, Ala. Code 1975, provides that an owner of public or private land used for certain recreational purposes owes no duty to users of the land except for injury caused by a "wilful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity."

Article 2 of the recreational-use statutes, enacted in 1981, applies specifically to owners of noncommercial, public land used for recreational purposes and it provides those owners with even greater protections than

Article 1. See Ala. Code 1975, § 35-15-22 (stating, in relevant part, that an owner of outdoor recreational land "owes no duty of care to inspect or keep such land safe for entry or use by any person for any recreational purpose, or to give warning of a dangerous condition, use, structure, or activity on such land to persons entering for such persons") and § 35-15-23 (stating, in relevant part, that an owner of outdoor recreational land does not (1) "[e]xtend any assurance that the outdoor recreational land is safe for any purpose"; (2) "[a]ssume responsibility for or incur legal liability for any injury … as a result of the entry on or use of such land by such person for any recreational purpose"; or (3) "[c]onfer upon such person the legal status of an invitee or licensee to whom a duty of care is owed"). Relevant here, § 35-15-24, Ala. Code 1975, carves out an exception to the liability protections provided in § 35-15-22 and § 35-15-23. Section 35-15-24 states that an owner of land is not shielded from liability when a condition of the land involves an "unreasonable risk of death or serious bodily harm," § 35-15-24(a)(2), and, having such knowledge, the owner "chooses not to guard or warn [of the condition], in disregard of the possible consequences." § 35-15-24(a)(4). In my opinion, Articles 1 and 2 of the recreational-use statutes should be construed

43

together such that the "wilful or malicious" requirement of § 35-15-3 in Article 1 applies equally to § 35-15-24 in Article 2. Thus, the exception to liability found in § 35-15-24 can be satisfied only when an owner of land willfully or maliciously fails to warn or guard against a known condition of the land that involves an unreasonable risk of death or serious bodily harm. See Grice v. City of Dothan, 670 F. Supp. 318, 321 (M.D. Ala. 1987) (noting that Articles 1 and 2 of the recreational use statutes "are to be read complimentary to each other"); see also Clark v. Tennessee Valley Auth., 606 F. Supp. 130, 131 (1985) (noting that the statutes in Article 2, which were enacted in 1981, provide owners of noncommercial public recreational land with "even tighter limitations" than the statues in Article 1 and that the "1981 piece of legislation recognizes a public policy in Alabama to encourage public owners to allow the opening up and promotion of their facilities without exposing themselves to law suits").